# KENNEDY, ATTORNEY GENERAL, v.
# MENDOZA-MARTINEZ.

No. 2.   Argued October 10–11, 1961.—Restored to the calendar for
reargument April 2, 1962.—Reargued December 4, 1962.—
Decided February 18, 1963.*

---

*Together with No. 3, *Rusk, Secretary of State,* v. *Cort,* on appeal
from the United States District Court for the District of Columbia,
argued October 11, 1961, decided in part and set for reargument
April 2, 1962, reargued December 4–5, 1962.

Bruce J. Terris reargued the cause for appellant in No. 2. *J. William Doolittle* reargued the cause for appellant in No. 3. On the briefs in both cases were *Solicitor Gen-*

*eral Cox, Assistant Attorney General Miller, Oscar H. Davis, Beatrice Rosenberg* and *Jerome M. Feit.*

*Thomas R. Davis* reargued the cause for appellee in No. 2. With him on the brief was *John W. Willis.*

*Leonard B. Boudin* reargued the cause for appellee in No. 3. With him on the brief was *Victor Rabinowitz.*

*Jack Wasserman, David Carliner, Rowland Watts, Stephen J. Pollak* and *Osmond K. Fraenkel* filed briefs for the American Civil Liberties Union, as *amicus curiae,* urging affirmance in both cases.

*Milton V. Freeman, Robert E. Herzstein, Horst Kurnik* and *Charles A. Reich* filed a brief, urging affirmance in No. 3, for Angelika Schneider, as *amicus curiae.*

MR. JUSTICE GOLDBERG delivered the opinion of the Court.

We are called upon in these two cases to decide the grave and fundamental problem, common to both, of the constitutionality of Acts of Congress which divest an American of his citizenship for "[d]eparting from or remaining outside of the jurisdiction of the United States in time of war or . . . national emergency for the purpose of evading or avoiding training and service" in the Nation's armed forces.[1]

---

[1] In question in No. 2, *Kennedy* v. *Mendoza-Martinez,* is § 401 (j) of the Nationality Act of 1940, added in 1944, 58 Stat. 746, which reads in full as follows:

"A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by . . .

"(j) Departing from or remaining outside of the jurisdiction of the United States in time of war or during a period declared by the President to be a period of national emergency for the purpose of evading or avoiding training and service in the land or naval forces of the United States."

## I. The Facts.

### A. *Mendoza-Martinez—No. 2.*

The facts of both cases are not in dispute. Mendoza-Martinez, the appellee in No. 2, was born in this country in 1922 and therefore acquired American citizenship by birth. By reason of his parentage, he also, under Mexican law, gained Mexican citizenship, thereby possessing dual nationality. In 1942 he departed from this country and went to Mexico solely, as he admits, for the purpose of evading military service in our armed forces. He concedes that he remained there for that sole purpose until November 1946, when he voluntarily returned to this country. In 1947, in the United States District Court for the Southern District of California, he pleaded guilty to and was convicted of evasion of his service obligations in violation of § 11 of the Selective Training and Service Act of 1940.[2] He served the imposed sentence of a year and a day. For all that appears in the record, he was, upon his release, allowed to reside undisturbed in this country until

Its successor and counterpart, § 349 (a) (10) of the Immigration and Nationality Act of 1952, 66 Stat. 163, 267–268, 8 U. S. C. § 1481 (a) (10), is challenged in No. 3, *Rusk* v. *Cort*, and reads as follows:

"From and after the effective date of this Act a person who is a national of the United States whether by birth or naturalization, shall lose his nationality by— . . .

"(10) departing from or remaining outside of the jurisdiction of the United States in time of war or during a period declared by the President to be a period of national emergency for the purpose of evading or avoiding training and service in the military, air, or naval forces of the United States. For the purposes of this paragraph failure to comply with any provision of any compulsory service laws of the United States shall raise the presumption that the departure from or absence from the United States was for the purpose of evading or avoiding training and service in the military, air, or naval forces of the United States."

[2] 54 Stat. 894, as amended, 50 U. S. C. App. (1946 ed.) § 311.

1953, when, after a lapse of five years, he was served with a warrant of arrest in deportation proceedings. This was premised on the assertion that, by remaining outside the United States to avoid military service after September 27, 1944, when § 401 (j) took effect, he had lost his American citizenship. Following hearing, the Attorney General's special inquiry officer sustained the warrant and ordered that Mendoza-Martinez be deported as an alien. He appealed to the Board of Immigration Appeals of the Department of Justice, which dismissed his appeal.

Thereafter, Mendoza-Martinez brought a declaratory judgment action in the Federal District Court for the Southern District of California, seeking a declaration of his status as a citizen, of the unconstitutionality of § 401 (j), and of the voidness of all orders of deportation directed against him. A single-judge District Court in an unreported decision entered judgment against Mendoza-Martinez in 1955, holding that by virtue of § 401 (j), which the court held to be constitutional, he had lost his nationality by remaining outside the jurisdiction of the United States after September 27, 1944. The Court of Appeals for the Ninth Circuit affirmed the judgment, 238 F. 2d 239. This Court, in 1958, *Mendoza-Martinez* v. *Mackey,* 356 U. S. 258, granted certiorari, vacated the judgment, and remanded the cause to the District Court for reconsideration in light of its decision a week earlier in *Trop* v. *Dulles,* 356 U. S. 86.

On September 24, 1958, the District Court announced its new decision, also unreported, that in light of *Trop* § 401 (j) is unconstitutional because not based on any "rational nexus . . . between the content of a specific power in Congress and the action of Congress in carrying that power into execution." On direct appeal under 28 U. S. C. § 1252, this Court noted probable jurisdiction, 359 U. S. 933, and then of its own motion remanded the cause, this time with permission to the parties to amend

the pleadings to put in issue the question of whether the facts as determined on the draft-evasion conviction in 1947 collaterally estopped the Attorney General from now claiming that Mendoza-Martinez had lost his American citizenship while in Mexico. *Mackey* v. *Mendoza-Martinez,* 362 U. S. 384.

The District Court on remand held that the Government was not collaterally estopped because the 1947 criminal proceedings entailed no determination of Mendoza-Martinez' citizenship. The court, however, reaffirmed its previous holding that § 401 (j) is unconstitutional, adding as a further basis of invalidity that § 401 (j) is "essentially penal in character and deprives the plaintiff of procedural due process. . . . [T]he requirements of procedural due process are not satisfied by the administrative hearing of the Immigration Service nor in this present proceedings."[3] The Attorney General's current appeal is from this decision. Probable jurisdiction was noted on February 20, 1961, 365 U. S. 809. The case was argued last Term, and restored to the calendar for reargument this Term, 369 U. S. 832.

## B. *Cort—No. 3.*

Cort, the appellee in No. 3, is also a native-born American, born in Boston in 1927. Unlike Mendoza-Martinez, he has no dual nationality. His wife and two young children are likewise American citizens by birth. Following receipt of his M. D. degree from the Yale University School of Medicine in 1951, he went to England for the purpose of undertaking a position as a Research Fellow at Cambridge University. He had earlier registered in timely and proper fashion for the draft and shortly before

---

[3] The memorandum opinion in which the quoted statement appears is unreported, but the findings of fact, conclusions of law, and judgment of the court are reported at 192 F. Supp. 1.

his departure supplemented his regular Selective Service registration by registering under the newly enacted Doctors Draft Act.[4]   In late 1951 he received a series of letters from the American Embassy in London instructing him to deliver his passport to it to be made "valid only for return to the United States."   He did not respond to these demands because, he now says in an affidavit filed in the trial court in this proceeding, "I believed that they were unlawful and I did not wish to subject myself to this and similar forms of political persecution then prevalent in the United States. . . .   I was engaged in important research and teaching work in physiology and I desired to continue earning a livelihood for my family."   Cort had been a member of the Communist Party while he was a medical student at Yale from 1946 to 1951, except for the academic year 1948–1949 when he was in England.   In late 1952, while still in England at Cambridge, he accepted a teaching position for the following academic year at Harvard University Medical School.   When, however, the school discovered through further correspondence that he had not yet fulfilled his military obligations, it advised him that it did not regard his teaching position as essential enough to support his deferment from military service in order to enter upon it.   Thereafter, his local draft board in Brookline, Massachusetts, notified him in February 1953 that his request for deferment was denied and that he should report within 30 days for a physical examination either in Brookline or in Frankfurt, Germany.   On June 4 and on July 3 the draft board again sent Cort notices to report for a physical examination, the first notice for examination on July 1 in Brookline, and the second for examination within 30 days in Frankfurt.   He did not appear at either place, and the board on August 13 ordered him to report for induction on September 14,

---

[4] 64 Stat. 826, 50 U. S. C. App. § 454 *et seq.*

1953. He did not report, and consequently he was indicted in December 1954 for violation of § 12 (a) of the Selective Service Act of 1948 [5] by reason of his failure to report for induction. This indictment is still outstanding. His complaint in this action states that he did not report for induction because he believed "that the induction order was not issued in good faith to secure his military services, that his past political associations and present physical disabilities made him ineligible for such service, and that he was being ordered to report back to the United States to be served with a Congressional committee subpoena or indicted under the Smith Act . . . ." Meanwhile, the British Home Office had refused to renew his residence permit, and in mid-1954 he and his family moved to Prague, Czechoslovakia, where he took a position as Senior Scientific Worker at the Cardiovascular Institute. He has lived there since.

In April 1959, his previous United States passport having long since expired, Cort applied at the American Embassy in Prague for a new one. His complaint in this action states that he wanted the passport "in order to return to the United States with his wife and children so that he might fulfill his obligations under the Selective Service laws and his wife might secure medical treatment for multiple sclerosis." Mrs. Cort received a passport and came to this country temporarily in late 1959, both for purposes of medical treatment and to facilitate arrangements for her husband's return. Cort's application, however, was denied on the ground that he had, by his failure to report for induction on September 14, 1953, as ordered, remained outside the country to avoid military service and thereby automatically forfeited his American citizenship by virtue of § 349 (a)(10) of the Immigration

---

[5] 62 Stat. 622, 50 U. S. C. App. § 462 (a). The short title of the Act has since 1951 been the Universal Military Training and Service Act. 65 Stat. 75, 50 U. S. C. App. § 451 (a).

and Nationality Act of 1952, which had superseded § 401 (j). The State Department's Passport Board of Review affirmed the finding of expatriation, and the Department's legal adviser affirmed the decision. Cort, through counsel, thereupon brought this suit in the District Court for the District of Columbia for a declaratory judgment that he is a citizen of the United States, for an injunction against enforcement of § 349 (a)(10) because of its unconstitutionality, and for an order directing revocation of the certificate of loss of nationality and issuance of a United States passport to him. Pursuant to Cort's demand, a three-judge court was convened. The court held that he had remained outside the United States to evade military service, but that § 349 (a)(10) is unconstitutional because "We perceive no substantial difference between the constitutional issue in the Trop case and the one facing us." It therefore concluded that Cort is a citizen of this country and enjoined the Secretary of State from withholding a passport from Cort on the ground that he is not a citizen and from otherwise interfering with his rights of citizenship. *Cort* v. *Herter,* 187 F. Supp. 683.

The Secretary of State appealed directly to this Court, 28 U. S. C. §§ 1252, 1253, which postponed the question of jurisdiction to the hearing of the case on the merits. 365 U. S. 808. The preliminary question of jurisdiction was affirmatively resolved last Term, *Rusk* v. *Cort,* 369 U. S. 367, leaving the issue of the validity of § 349 (a)(10) for decision now, after reargument. 369 U. S., at 380.

Before we consider the essential question in these cases, the constitutionality of §§ 401 (j) and 349 (a)(10), two preliminary issues peculiar to No. 2 must be discussed.

## II. THE THREE-JUDGE COURT ISSUE.

At the threshold in Mendoza-Martinez' case is the question whether the proceeding should have been heard by a three-judge District Court convened pursuant to 28

U. S. C. § 2282, which requires such a tribunal as a prerequisite to the granting of any "interlocutory or permanent injunction restraining the enforcement, operation or execution of any Act of Congress for repugnance to the Constitution of the United States . . . ." If § 2282 governs this litigation, we are once again faced with the prospect of a remand and a new trial, this time by a three-judge panel. We are, however, satisfied that the case was properly heard by a single district judge, as both parties urge.

In the complaint under which the case was tried the first and second times, Mendoza-Martinez asked for no injunctive relief, and none was granted. In the amended complaint which he filed in 1960 to put in issue the question of collateral estoppel, he added a prayer asking the court to adjudge "that defendants herein are enjoined and restrained henceforth from enforcing" all deportation orders against him. However, it is abundantly clear from the amended trial stipulation which was entered into by the parties and approved by the judge to "govern the course of the trial," that the issues were framed so as not to contemplate any injunctive relief. The first question was articulated only in terms of whether the Government was "herein estopped by reason of the indictment and conviction of plaintiff for [draft evasion] . . . from denying that the plaintiff is now a national and citizen of the United States." The second question asked only for a declaration as to whether § 401 (j) was "unconstitutional, either on its face or as applied to the plaintiff herein." The conclusion that no request for injunctive relief nor even any contemplation of it attended the case as it went to trial is borne out by the total lack of reference to injunctive relief in the District Court's memorandum opinion, findings of fact and conclusions of law, and judgment. See 192 F. Supp. 1. The relief granted was merely a declaration that the 1944 Amendment "is

unconstitutional, both on its face and as applied to the plaintiff herein," and "[t]hat the plaintiff is now, and ever since the date of his birth has been, a national and citizen of the United States." Thus, despite the amendment to Mendoza-Martinez' complaint before the third trial, it is clear that neither the parties nor the judge at any relevant time regarded the action as one in which injunctive relief was material to the disposition of the case. Since no injunction restraining the enforcement of § 401 (j) was at issue, § 2282 was not in terms applicable to require the convening of a three-judge District Court.

Whether an action solely for declaratory relief would under all circumstances be inappropriate for consideration by a three-judge court we need not now decide, for it is clear that in the present case the congressional policy underlying the statute was not frustrated by trial before a single judge. The legislative history of § 2282 and of its complement, § 2281,[6] requiring three judges to hear injunctive suits directed against federal and state legislation, respectively, indicates that these sections were enacted to prevent a single federal judge from being able to paralyze totally the operation of an entire regulatory scheme, either state or federal, by issuance of a broad injunctive order. Section 2281 "was a means of protecting the increasing body of state legislation regulating economic enterprise from invalidation by a conventional suit in equity. . . . The crux of the business is procedural protection against an improvident state-wide doom by a federal court of a state's legislative policy. This was the aim of Congress . . . ." *Phillips* v. *United States,* 312 U. S. 246,

---

[6] In more detail, 28 U. S. C. § 2281 requires a three-judge court to be convened in order to grant "An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board or commission acting under State statutes . . . upon the ground of the unconstitutionality of such statute . . . ."

250–251. Repeatedly emphasized during the congressional debates on § 2282 were the heavy pecuniary costs of the unforeseen and debilitating interruptions in the administration of federal law which could be wrought by a single judge's order, and the great burdens entailed in coping with harassing actions brought one after another to challenge the operation of an entire statutory scheme, wherever jurisdiction over government officials could be acquired, until a judge was ultimately found who would grant the desired injunction. 81 Cong. Rec. 479–481, 2142–2143 (1937).

The present action, which in form was for declaratory relief and which in its agreed substance did not contemplate injunctive relief, involves none of the dangers to which Congress was addressing itself. The relief sought and the order entered affected an Act of Congress in a totally noncoercive fashion. There was no interdiction of the operation at large of the statute. It was declared unconstitutional, but without even an injunctive sanction against the application of the statute by the Government to Mendoza-Martinez. Pending review in the Court of Appeals and in this Court, the Government has been free to continue to apply the statute. That being the case, there is here no conflict with the purpose of Congress to provide for the convocation of a three-judge court whenever the operation of a statutory scheme may be immediately disrupted before a final judicial determination of the validity of the trial court's order can be obtained. Thus there was no reason whatever in this case to invoke the special and extraordinary procedure of a three-judge court. Compare *Schneider* v. *Rusk, post,* p. 224, decided this day.

### III. The Collateral-Estoppel Issue.

Mendoza-Martinez' second amended complaint, filed in 1960 pursuant to the suggestion of this Court earlier that year, charged that "the government of the United States

has admitted the fact of his United States citizenship by virtue of the indictment and judgment of conviction [in 1947 for draft evasion] . . . and is therefore collaterally estopped now to deny such citizenship . . . ." The District Court rejected this assertion. Mendoza-Martinez renews it here as an alternative ground for upholding the judgment entered below "That the plaintiff is now, and ever since the date of his birth has been, a national and citizen of the United States." 192 F. Supp., at 3.

We too reject Mendoza-Martinez' contention on this point. His argument, stated more fully, is as follows: The Selective Training and Service Act of 1940 applies only to citizens and resident aliens. Both the indictment and the judgment spoke in terms of his having remained in Mexico for the entire period from November 15, 1942, until November 1, 1946, when he returned to this country.[7]

---

[7] The indictment was in three counts, but Mendoza-Martinez was convicted only on Count I, which reads in full as follows:

"Defendant FRANK MARTINEZ MENDOZA, a male person within the class made subject to selective service under the Selective Training and Service Act of 1940, as amended, registered as required by said act and the regulations promulgated thereunder and became a registrant of Local Board No. 137, said board being then and there duly created and acting, under the Selective Service System established by said act, in Kern County, California, in the Northern Division of the Southern District of California; and on or about November 15, 1942, in violation of the provisions of said act and the regulations promulgated thereunder, the defendant did knowingly evade service in the land or naval forces of the United States of America in that he did knowingly depart from the United States and go to a foreign country, namely: Mexico, for the purpose of evading service in the land or naval forces of the United States and did there remain until on or about November 1, 1946."

The judgment and commitment, similarly, stated that Mendoza-Martinez was convicted of:

"Having on or about November 15th 1942, knowingly departed from the United States to Mexico, for the purpose of evading service in the land or naval forces of the United States and having remained there until on or about November 1st 1946."

For the period from September 27, 1944, when § 401 (j) became effective, until November 1, 1946, he could not have been in violation of our draft laws unless he remained a citizen of the United States, since the draft laws do not apply to nonresident aliens. Therefore, he concludes, the Government must be taken to have admitted that he did not lose his citizenship by remaining outside the country after September 27, 1944, because it charged him with draft evasion for that period as well as for the period preceding that date.

It is true that "as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered," *Cromwell* v. *County of Sac,* 94 U. S. 351, 353, the findings in a prior criminal proceeding may estop a party in a subsequent civil action, *Emich Motors Corp.* v. *General Motors Corp.,* 340 U. S. 558, 568–569, and that the United States may be estopped to deny even an erroneous prior determination of status, *United States* v. *Moser,* 266 U. S. 236. However, Mendoza-Martinez' citizenship status was not at issue in his trial for draft evasion. Putting aside the fact that he pleaded guilty, which in itself may support the conclusion that his citizenship status was not litigated and thereby without more preclude his assertion of estoppel,[8] the basic flaw in his argument is in the assertion that he was charged with a continuing violation of the draft laws while he remained in Mexico, particularly after September 27, 1944, the date on which § 401 (j) became effective. He was in fact charged with a violation "on or about November 15, 1942," because he "did knowingly evade service . . . in that he did knowingly depart from

---

[8] Compare *United States* v. *International Building Co.,* 345 U. S. 502, in which a prior judicial determination of a tax issue, based on the parties' stipulation, was refused collateral-estoppel effect in a later action. See also Restatement, Judgments, § 68, comments *g, h, i.*

the United States and go to a foreign country, namely: Mexico, for the purpose of evading service . . . ." This constituted the alleged violation. The additional language that he "did there remain until on or about November 1, 1946," was merely surplusage in relation to the substantive offense, although it might, for example, serve a purpose in relation to problems connected with the tolling of the statute of limitations. No language appears charging the elements of violation—knowledge and purpose to evade—in connection with it. The only crime charged is what happened "on or about November 15, 1942," and conviction thereon, even if it had entailed a finding as to Mendoza-Martinez' citizenship on that date,[9] in nowise estopped the Government with reference to his status after September 27, 1944.

The trial court's judgment was worded no differently. Mendoza-Martinez was convicted of:

> "Having on or about November 15th 1942, knowingly departed from the United States to Mexico, for the purpose of evading service in the land or naval forces of the United States and having remained there until on or about November 1st 1946."

Again, the language relating to the time during which Mendoza-Martinez remained in Mexico was not tied to the words stating knowledge and purpose to evade service. Thus, the conviction entailed no actual or necessary finding about Mendoza-Martinez' citizenship status between September 27, 1944, and November 1, 1946, and the Government was not estopped from denying his citizenship in the present proceedings.

---

[9] Since the Selective Training and Service Act of 1940 applied both to citizens and resident aliens, there was no need to determine in which category Mendoza-Martinez fell "on or about November 15, 1942." In the present proceeding it is, of course, not disputed that Mendoza-Martinez was an American citizen on that date.

## IV. THE CONSTITUTIONAL ISSUES.

### A. *Basic Principles.*

Since the validity of an Act of Congress is involved, we begin our analysis mindful that the function we are now discharging is "the gravest and most delicate duty that this Court is called upon to perform." *Blodgett* v. *Holden,* 275 U. S. 142, 148 (separate opinion of Holmes, J.). This responsibility we here fulfill with all respect for the powers of Congress, but with recognition of the transcendent status of our Constitution.

We deal with the contending constitutional arguments in the context of certain basic and sometimes conflicting principles. Citizenship is a most precious right. It is expressly guaranteed by the Fourteenth Amendment to the Constitution, which speaks in the most positive terms.[10] The Constitution is silent about the permissibility of involuntary forfeiture of citizenship rights.[11] While it confirms citizenship rights, plainly there are imperative obligations of citizenship, performance of which Congress in the exercise of its powers may constitutionally exact. One of the most important of these is to serve the country in time of war and national emergency. The powers of Congress to require military service for the common defense are broad and far-reach-

---

[10] U. S. Const., Amend. XIV, § 1: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. . . ." This constitutional statement is to be interpreted in light of pre-existing common-law principles governing citizenship. *United States* v. *Wong Kim Ark,* 169 U. S. 649.

[11] There is, however, no disagreement that citizenship may be voluntarily relinquished or abandoned either expressly or by conduct. See, *e. g., Perez* v. *Brownell,* 356 U. S. 44, 48–49; *id.,* at 66–67 (WARREN, C. J., dissenting).

ing,[12] for while the Constitution protects against invasions of individual rights, it is not a suicide pact. Similarly, Congress has broad power under the Necessary and Proper Clause to enact legislation for the regulation of foreign affairs. Latitude in this area is necessary to ensure effectuation of this indispensable function of government.[13]

These principles, stemming on the one hand from the precious nature of the constitutionally guaranteed rights of citizenship, and on the other from the powers of Congress and the related obligations of individual citizens, are urged upon us by the parties here. The Government argues that §§ 401 (j) and 349 (a)(10) are valid as an exercise of Congress' power over foreign affairs, of its war power, and of the inherent sovereignty of the Government. Appellees urge the provisions' invalidity as not within any of the powers asserted, and as imposing a cruel and unusual punishment.

We recognize at the outset that we are confronted here with an issue of the utmost import. Deprivation of citizenship—particularly American citizenship, which is "one of the most valuable rights in the world today," Report of the President's Commission on Immigration and Naturalization (1953), 235—has grave practical consequences. An expatriate who, like Cort, had no other nationality becomes a stateless person—a person who not only has no rights as an American citizen, but no membership in any national entity whatsoever. "Such individuals as do not possess any nationality enjoy, in general, no protection whatever, and if they are aggrieved by a State they have no means of redress, since there is no State which is competent to take up their case. As far as the Law of Na-

---

[12] *Ex parte Quirin,* 317 U. S. 1, 25–26. See also *Home Bldg. & Loan Assn.* v. *Blaisdell,* 290 U. S. 398, 426; *Hirabayashi* v. *United States,* 320 U. S. 81, 93.

[13] *Mackenzie* v. *Hare,* 239 U. S. 299, 311–312; *Perez* v. *Brownell, supra,* 356 U. S., at 57–58.

tions is concerned, there is, apart from restraints of morality or obligations expressly laid down by treaty . . . no restriction whatever to cause a State to abstain from maltreating to any extent such stateless individuals." 1 Oppenheim, International Law (8th ed., Lauterpacht, 1955), § 291, at 640.[14] The calamity is "[n]ot the loss of specific rights, then, but the loss of a community willing and able to guarantee any rights whatsoever . . . ." Arendt, The Origins of Totalitarianism (1951), 294. The stateless person may end up shunted from nation to nation, there being no one obligated or willing to receive him,[15] or, as in Cort's case, may receive the dubious sanctuary of a Communist regime lacking the essential liberties precious to American citizenship.[16]

---

[14] See also Garner, Uniformity of Law in Respect to Nationality, 19 Am. J. Int'l L. 547 (1925).

[15] See Seckler-Hudson, Statelessness: With Special Reference to the United States (1934), 244–253; Preuss, International Law and Deprivation of Nationality, 23 Geo. L. J. 250 (1934); Holborn, The Legal Status of Political Refugees, 1920–1938, 32 Am. J. Int'l L. 680 (1938). See also *Shaughnessy* v. *United States ex rel. Mezei*, 345 U. S. 206.

[16] The drastic consequences of statelessness have led to reaffirmation in the United Nations Universal Declaration of Human Rights, Article 15, of the right of every individual to retain a nationality. U. N Doc. No. A/810, pp. 71, 74 (1948) (adopted by the U. N. General Assembly on Dec. 10, 1948), reprinted in UNESCO, Human Rights, A Symposium, App. III (1949). See also A Study on Statelessness, U. N. Doc. No. E/1112 (1949); Second Report on the Elimination or Reduction of Statelessness, U. N. Doc. No. A/CN. 4/75 (1953); Weis, The United Nations Convention on the Reduction of Statelessness, 1961, 11 Int'l & Comp. L. Q. 1073 (1962), and authorities cited therein.

The evils of statelessness were recognized in the Report of the President's Commission on Immigration and Naturalization (1953), 241, and the treatise writers have unanimously disapproved of statutes which denationalize individuals without regard to whether they have dual nationality. Borchard, Diplomatic Protection of Citizens

## B. *The Perez and Trop Cases.*

The basic principles here involved, the gravity of the issue, and the arguments bearing upon Congress' power to forfeit citizenship were considered by the Court in relation to different provisions of the Nationality Act of 1940 in two cases decided on the same day less than five years ago: *Perez* v. *Brownell,* 356 U. S. 44, and *Trop* v. *Dulles,* 356 U. S. 86.

In *Perez,* § 401 (e), which imposes loss of nationality for "[v]oting in a political election in a foreign state or participating in an election or plebiscite to determine the sovereignty over foreign territory," was upheld by a closely divided Court as a constitutional exercise of Congress' power to regulate foreign affairs. The Court reasoned that since withdrawal of citizenship of Americans who vote in foreign elections is reasonably calculated to effect the avoidance of embarrassment in the conduct of foreign relations, such withdrawal is within the power of Congress, acting under the Necessary and Proper Clause. Since the Court sustained the application of § 401 (e) to denationalize Perez, it did not have to deal with § 401 (j), upon which the Government had also relied, and it expressly declined to rule on the constitutionality of that section, 356 U. S., at 62. There were three opinions written in dissent. The principal one, that of THE CHIEF JUSTICE, recognized "that citizenship may not only be voluntarily renounced through exercise of the right of expatriation but also by other actions in derogation of undivided allegiance to this country," *id.,* at 68, but concluded that "[t]he mere act of voting in a foreign election, however, without regard to the circumstances attending

Abroad (1916), §§ 262, 334; Fenwick, International Law (3d ed. 1948), 263; 1 Oppenheim, *supra,* §§ 313–313a; Gettys, The Law of Citizenship in the United States (1934), 137–138, 160.

the participation, is not sufficient to show a voluntary abandonment of citizenship," *id.*, at 78.

In *Trop,* § 401 (g), forfeiting the citizenship of any American who is guilty of "[d]eserting the military or naval forces of the United States in time of war, provided he is convicted thereof by court martial and as the result of such conviction is dismissed or dishonorably discharged . . . ," was declared unconstitutional. There was no opinion of the Court. THE CHIEF JUSTICE wrote an opinion for four members of the Court, concluding that § 401 (g) was invalid for the same reason that he had urged as to § 401 (e) in his dissent in *Perez,* and that it was also invalid as a cruel and unusual punishment imposed in violation of the Eighth Amendment. JUSTICE BRENNAN conceded that it is "paradoxical to justify as constitutional the expatriation of the citizen who has committed no crime by voting in a Mexican political election, yet find unconstitutional a statute which provides for the expatriation of a soldier guilty of the very serious crime of desertion in time of war," 356 U. S., at 105. Notwithstanding, he concurred because "the requisite rational relation between this statute and the war power does not appear . . . ," *id.*, at 114. Justice Frankfurter, joined by three other Justices, dissented on the ground that § 401 (g) did not impose punishment at all, let alone cruel and unusual punishment, and was within the war powers of Congress.

C. *Sections 401 (j) and 349 (a)(10) as Punishment.*

The present cases present for decision the constitutionality of a section not passed upon in either *Perez* or *Trop*—§ 401 (j), added in 1944, and its successor and present counterpart, § 349 (a)(10) of the Immigration and Nationality Act of 1952. We have come to the conclusion that there is a basic question in the present cases,

the answer to which obviates a choice here between the powers of Congress and the constitutional guarantee of citizenship. That issue is whether the statutes here, which automatically—without prior court or administrative proceedings—impose forfeiture of citizenship, are essentially penal in character, and consequently have deprived the appellees of their citizenship without due process of law and without according them the rights guaranteed by the Fifth and Sixth Amendments, including notice, confrontation, compulsory process for obtaining witnesses, trial by jury, and assistance of counsel. This issue was not relevant in *Trop* because, in contrast to §§ 401 (j) and 349 (a)(10), § 401 (g) required conviction by court-martial for desertion before forfeiture of citizenship could be inflicted. In *Perez* the contention that § 401 (e) was penal in character was impliedly rejected by the Court's holding, based on legislative history totally different from that underlying §§ 401 (j) and 349 (a)(10), that voting in a political election in a foreign state "is regulable by Congress under its power to deal with foreign affairs." 356 U. S., at 59. Compare *Dent* v. *West Virginia*, 129 U. S. 114; *Hawker* v. *New York*, 170 U. S. 189; *Flemming* v. *Nestor*, 363 U. S. 603. Indeed, in *Trop* THE CHIEF JUSTICE observed that "Section 401 (j) decrees loss of citizenship without providing any semblance of procedural due process whereby the guilt of the draft evader may be determined before the sanction is imposed . . . ," 356 U. S., at 94, and Justice Frankfurter in dissent alluded to the due process overtones of the requirement in § 401 (g) of prior conviction for desertion by court-martial, *id.*, at 116–117.

It is fundamental that the great powers of Congress to conduct war and to regulate the Nation's foreign relations are subject to the constitutional requirements of due

process.[17] The imperative necessity for safeguarding these rights to procedural due process under the gravest of emergencies has existed throughout our constitutional history, for it is then, under the pressing exigencies of crisis, that there is the greatest temptation to dispense with fundamental constitutional guarantees which, it is feared, will inhibit governmental action. "The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances." *Ex parte Milligan,* 4 Wall. 2, 120–121.[18] The rights guaranteed by the Fifth and Sixth Amendments are "preserved to every one accused of crime who is not attached to the army, or navy, or militia in actual service." *Id.,* at 123.[19] "[I]f society is disturbed by civil commotion—if the passions of men are aroused and the restraints of law weakened, if not disregarded—these safeguards need, and should receive, the watchful care of those intrusted with the guardianship of the Constitution and laws. In no other way can we transmit to posterity unimpaired the blessings of liberty, consecrated by the sacrifices of the Revolution." *Id.,* at 124.

We hold §§ 401 (j) and 349 (a)(10) invalid because in them Congress has plainly employed the sanction of deprivation of nationality as a punishment—for the offense of leaving or remaining outside the country to evade mili-

---

[17] War powers: *United States* v. *Cohen Grocery Co.,* 255 U. S. 81, 88; *Ex parte Endo,* 323 U. S. 283, 298–300. Foreign-affairs powers: *Kent* v. *Dulles,* 357 U. S. 116, 125–130; *Shachtman* v. *Dulles,* 96 U. S. App. D. C. 287, 225 F. 2d 938 (1955).

[18] See also *Hamilton* v. *Kentucky Distilleries Co.,* 251 U. S. 146, 156; *United States* v. *Cohen Grocery Co., supra; Ex parte Endo, supra.*

[19] Compare *Ex parte Mason,* 105 U. S. 696; *Kahn* v. *Anderson,* 255 U. S. 1, 8–9; *Ex parte Quirin,* 317 U. S. 1, 29, 38–46.

tary service—without affording the procedural safeguards guaranteed by the Fifth and Sixth Amendments.[20]   Our forefathers "intended to safeguard the people of this country from punishment without trial by duly constituted courts. . . .   And even the courts to which this important function was entrusted were commanded to stay their hands until and unless certain tested safeguards were observed.   An accused in court must be tried by an impartial jury, has a right to be represented by counsel, [and] must be clearly informed of the charge against him . . . ." *United States* v. *Lovett,* 328 U. S. 303, 317.   See also *Chambers* v. *Florida,* 309 U. S. 227, 235–238.

As the Government concedes, §§ 401 (j) and 349 (a) (10) automatically strip an American of his citizenship, with concomitant deprivation "of all that makes life worth living," *Ng Fung Ho* v. *White,* 259 U. S. 276, 284–285, whenever a citizen departs from or remains outside the jurisdiction of this country for the purpose of evading his military obligations.   Conviction for draft evasion, as

---

[20] "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." U. S. Const., Amend. V.

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence." U. S. Const., Amend. VI.

Cort's case illustrates, is not prerequisite to the operation of this sanction.[21]  Independently of prosecution, forfeiture of citizenship attaches when the statutory set of facts develops.  It is argued that the availability after the fact of administrative and judicial proceedings, including the machinery the Court approved last Term in *Rusk v. Cort,* 369 U. S. 367, to contest the validity of the sanction meets the measure of due process.  But the legislative history and judicial expression with respect to every congressional enactment relating to the provisions in question dating back to 1865 establish that forfeiture of citizenship is a penalty for the act of leaving or staying outside the country to avoid the draft.  This being so, the Fifth and Sixth Amendments mandate that this punishment cannot be imposed without a prior criminal trial and all its incidents, including indictment, notice, confrontation, jury trial, assistance of counsel, and compulsory process for obtaining witnesses.  If the sanction these sections impose is punishment, and it plainly is, the procedural safeguards required as incidents of a criminal prosecution are lacking.  We need go no further.

---

[21] Thus the fact that Mendoza-Martinez was, as it happened, convicted of draft evasion before deportation proceedings were brought against him is of no relevance.  Even if the incidence of conviction for draft evasion were potentially relevant to the validity of §§ 401 (j) and 349 (a) (10), the fact is that the "crime" created by these sections includes an element not necessary to conviction for violation of § 11 of the Selective Training and Service Act of 1940— "[d]eparting from or remaining outside" the country "for the purpose of evading or avoiding [military] training and service . . . ."  See Comment, Power of Congress to Effect Involuntary Expatriation, 56 Mich. L. Rev. 1142, 1166 n. 102 (1958).  Mendoza-Martinez was thus never tried for any crime the elements of which are identical with or totally inclusory of those of § 401 (j), and hence was not even arguably accorded the procedural protections we here hold essential.

The punitive nature of the sanction here is evident under the tests traditionally applied to determine whether an Act of Congress is penal or regulatory in character, even though in other cases this problem has been extremely difficult and elusive of solution. Whether the sanction involves an affirmative disability or restraint,[22] whether it has historically been regarded as a punishment,[23] whether it comes into play only on a finding of *scienter*,[24] whether its operation will promote the traditional aims of punishment—retribution and deterrence,[25] whether the behavior to which it applies is already a crime,[26] whether an alternative purpose to which it may

---

[22] *Ex parte Garland,* 4 Wall. 333, 377; *United States* v. *Lovett,* 328 U. S. 303, 316; *Flemming* v. *Nestor,* 363 U. S. 603, 617.

[23] *Cummings* v. *Missouri,* 4 Wall. 277, 320–321; *Ex parte Wilson,* 114 U. S. 417, 426–429; *Mackin* v. *United States,* 117 U. S. 348, 350–352; *Wong Wing* v. *United States,* 163 U. S. 228, 237–238. Reference to history here is peculiarly appropriate. Though not determinative, it supports our holding to note that forfeiture of citizenship and the related devices of banishment and exile have throughout history been used as punishment. In ancient Rome, "There were many ways in which a man might lose his freedom, and with his freedom he necessarily lost his citizenship also. Thus he might be sold into slavery as an insolvent debtor, or condemned to the mines for his crimes as *servus poenae.*" Salmond, Citizenship and Allegiance, 17 L. Q. Rev. 270, 276 (1901). Banishment was a weapon in the English legal arsenal for centuries, 4 Bl. Comm. *377, but it was always "adjudged a harsh punishment even by men who were accustomed to brutality in the administration of criminal justice." Maxey, Loss of Nationality: Individual Choice or Government Fiat? 26 Albany L. Rev. 151, 164 (1962).

[24] *Helwig* v. *United States,* 188 U. S. 605, 610–612; *Child Labor Tax Case,* 259 U. S. 20, 37–38.

[25] *United States* v. *Constantine,* 296 U. S. 287, 295; *Trop* v. *Dulles, supra,* 356 U. S., at 96 (opinion of THE CHIEF JUSTICE); *id.,* at 111–112 (BRENNAN, J., concurring).

[26] *Lipke* v. *Lederer,* 259 U. S. 557, 562; *United States* v. *La Franca,* 282 U. S. 568, 572–573; *United States* v. *Constantine, supra,* 296 U. S., at 295.

rationally be connected is assignable for it,[27] and whether it appears excessive in relation to the alternative purpose, assigned [28] are all relevant to the inquiry, and may often point in differing directions. Absent conclusive evidence of congressional intent as to the penal nature of a statute, these factors must be considered in relation to the statute on its face. Here, although we are convinced that application of these criteria to the face of the statutes supports the conclusion that they are punitive, a detailed examination along such lines is unnecessary, because the objective manifestations of congressional purpose indicate conclusively that the provisions in question can only be interpreted as punitive.[29] A study of the history of the predecessor of § 401 (j), which "is worth a volume of logic," *New York Trust Co.* v. *Eisner,* 256 U. S. 345, 349, coupled with a reading of Congress' reasons for enacting § 401 (j), compels a conclusion that the statute's primary function is to serve as an additional penalty for

---

[27] *Cummings* v. *Missouri, supra,* 4 Wall., at 319; *Child Labor Tax Case, supra,* 259 U. S., at 43; *Lipke* v. *Lederer, supra,* 259 U. S., at 561–562; *United States* v. *La Franca, supra,* 282 U. S., at 572; *Trop* v. *Dulles, supra,* 356 U. S., at 96–97; *Flemming* v. *Nestor, supra,* 363 U. S., at 615, 617.

[28] *Cummings* v. *Missouri, supra,* 4 Wall., at 318;. *Helwig* v. *United States, supra,* 188 U. S., at 613; *United States* v. *Constantine, supra,* 296 U. S., at 295; *Rex Trailer Co.* v. *United States,* 350 U. S. 148, 154. But cf. *Child Labor Tax Case, supra,* 259 U. S., at 41; *Flemming* v. *Nestor, supra,* at 614, 616 and n. 9.

[29] Compare *Cummings* v. *Missouri,* 4 Wall. 277, 320, 322; *United States* v. *Lovett,* 328 U. S. 303, 308–312; Wormuth, Legislative Disqualifications as Bills of Attainder, 4 Vand. L. Rev. 603, 608 (1951); Note, Punishment: Its Meaning in Relation to Separation of Power and Substantive Constitutional Restrictions and Its Use in the Lovett, Trop, Perez, and Speiser Cases, 34 Ind. L. J. 231, 249–253 (1959); Comment, The Communist Control Act of 1954, 64 Yale L. J. 712, 723 (1955).

a special category of draft evader.[30]   Compare *Trop v. Dulles, supra,* 356 U. S., at 107–110 (BRENNAN, J., concurring).

### 1. *The Predecessor Statute and Judicial Construction.*

The subsections here in question have their origin in part of a Civil War "Act to amend the several Acts heretofore passed to provide for the Enrolling and Calling out the National Forces, and for other Purposes." Act of March 3, 1865, 13 Stat. 487.   Section 21 of that Act, dealing with deserters and draft evaders, was in terms punitive, providing that "in addition to the other lawful penalties of the crime of desertion," persons guilty thereof "shall be deemed and taken to have voluntarily relinquished and forfeited their rights of citizenship and their rights to become citizens . . . and all persons who, being duly enrolled, shall depart the jurisdiction of the district in which he is enrolled, or go beyond the limits of the United States, with intent to avoid any draft into the

---

[30] *Mackenzie v. Hare,* 239. U. S. 299, and *Savorgnan v. United States,* 338 U. S. 491, whatever the proposition for which they stand in connection with the power of Congress to impose loss of citizenship, compare *Perez v. Brownell, supra,* 356 U. S., at 51–52, 61–62 (opinion of the Court), with *id.,* at 68–73 (dissenting opinion of THE CHIEF JUSTICE) and *id.,* at 80 (dissenting opinion of JUSTICE DOUGLAS), are both plainly distinguishable, as is *Perez.*   The statutes in question in each of those cases provided loss of citizenship for noncriminal behavior instead of as an additional sanction attaching to behavior already a crime, and congressional expression attending their passage lacked the overwhelming indications of punitive purpose which characterized the enactments here.   Thus, basing decision as we do on the unmistakable penal intent underlying the statutes presently at issue, nothing in our holding is inconsistent with these other cases, and there is no occasion for us to pass upon any question of the power of Congress to act as it did in the statutes involved in those cases.   See note 43, *infra.*

military or naval service, duly ordered, shall be liable to the penalties of this section." [31]

The debates in Congress in 1865 confirm that the use of punitive language in § 21 was not accidental. The section as originally proposed inflicted loss of rights of citizenship only on deserters. Senator Morrill of Maine proposed amending the section to cover persons who leave the country to avoid the draft, stating, "I do not see why the same principle should not extend to those who leave the country to avoid the draft." Cong. Globe, 38th Cong., 2d Sess. 642 (1865). This "same principle" was punitive, because Senator Morrill was also worried that insofar as the section as originally proposed "provides for a penalty" to be imposed on persons who had theretofore deserted, there was question "whether it is not an *ex post facto* law, whether it is not fixing a penalty for an act already done." *Ibid.* Senator Johnson of Maryland attempted to allay Senator Morrill's concern by explaining that

> "the penalties are not imposed upon those who have deserted, if nothing else occurs, but only on those who have deserted and who shall not return within sixty days. The crime for which the punishment is inflicted is made up of the fact of an antecedent desertion, and a failure to return within sixty days. It is clearly within the power of Congress." *Ibid.*

This explanation satisfied the Senate sufficiently so that they accepted the section, with Senator Morrill's amendment, although Senator Hendricks of Indiana made one last speech in an effort to convince his colleagues of the bill's *ex post facto* nature and, even apart from that, of the excessiveness of the punishment, particularly as applied to draft evaders:

> "It seems to me to be very clear that this section proposes to punish desertions which have already

---

[31] The acts of Mendoza-Martinez and Cort would have been covered by this statute as well as by §§ 401 (j) and 349 (a)(10).

taken place, with a penalty which the law does not already prescribe. In other words it is an *ex post facto* criminal law which I think we cannot pass. . . . One of the penalties known very well to the criminal laws of the country is the denial of the right of suffrage and the right to hold offices of trust or profit.

"It seems to me this objection to the section is very clear, but I desire to suggest further that this section punishes desertions that may hereafter take place in the same manner, and it is known to Senators that one desertion recently created is not reporting when notified of the draft. . . . I submit to Senators that it is a horrible thing to deprive a man of his citizenship, of that which is his pride and honor, from the mere fact that he has been unable to report upon the day specified after being notified that he has been drafted. Certainly the punishment for desertion is severe enough. It extends now from the denial of pay up to death; that entire compass is given for the punishment of this offense. Why add this other? It cannot do any good." *Id.,* at 643.

In the House, the motion of New York's Representative Townsend to strike the section as a "despotic measure" which would "have the effect to deprive fifty thousand, and I do not know but one hundred thousand, people of their rights and privileges," was met by the argument of Representative Schenck of Ohio, the Chairman of the Military Committee, that "Here is a penalty that is lawful, wise, proper, and that should be added to the other lawful penalties that now exist against deserters." *Id.,* at 1155. After Representative Wilson of Iowa proposed an amendment, later accepted and placed in the enacted version of the bill, extending the draft-evasion portion to apply to persons leaving "the district in which they are enrolled" in addition to those leaving the country, Representative J. C. Allen of Illinois raised the *ex post facto*

objection to the section as a whole. *Id.,* at 1155–1156. Representative Schenck answered him much as Senator Johnson had replied in the Senate:

"The gentleman from Illinois [Mr. J. C. ALLEN] misapprehends this section from not having looked carefully, as I think, into its language. He thinks it retroactive. It is not so. It does not provide for punishing those who have deserted in their character of deserters acquired by having gone before the passage of the law, but of those only, who, being deserters, shall not return and report themselves for duty within sixty days. If the gentleman looks at the language of the section, he will find that we have carefully avoided making it retroactive. We give those who have deserted their country and their flag sixty days for repentance and return.

"Mr. J. C. ALLEN. Will not the infliction of this penalty on those who have failed to return to the Army be an additional penalty that did not exist at the time they deserted?

"Mr. SCHENCK. Yes, sir.

"Mr. J. C. ALLEN. Does not that make the law retroactive?

"Mr. SCHENCK. They are deserters now. We take them up in their present status and character as deserters, and punish them for continuing in that character. The gentleman refers to lawyers here. I believe he is a good lawyer himself. Does he not know that if a man steals a horse and runs away with it to the next county it is a continual act of larceny until he delivers up the horse?" *Id.,* at 1156.

The significance of these debates is, as these excerpts plainly show, that while there was a difference in both Houses as to whether the statute would be an *ex post facto* law, there was agreement among all the speakers on both

sides of that issue, as well as on both sides of the merits of the bill generally, that deprivation of rights of citizenship for leaving the country to evade the draft was a "penalty" and "punishment" for a "crime" and an "offense" and a violation of a "criminal law."

A number of state court judicial decisions rendered shortly after the Civil War lend impressive support to the conclusion that the predecessor of §§ 401 (j) and 349 (a)(10), § 21 of the 1865 statute, was a criminal statute imposing an additional punishment for desertion and draft evasion. The first and most important of these was *Huber* v. *Reily,* 53 Pa. 112 (1866), in which, as in most of the cases which followed,[32] the plaintiff had brought an action against the election judge of his home township, alleging that the defendant had refused to receive his ballot on the ground that plaintiff was a deserter and thereby disenfranchised under § 21, and that such refusal was wrongful because § 21 was unconstitutional. The asserted grounds of invalidity were that § 21 was an *ex post facto* law, that it was an attempt by Congress to regulate suffrage in the States and therefore outside Congress' sphere of power, and that it proposed to inflict pains and penalties without a trial and conviction, and was therefore prohibited by the Bill of Rights. In an opinion by Justice Strong, later a member of this Court, the Pennsylvania Supreme Court first characterized the statute in a way which compelled discussion of the asserted grounds of unconstitutionality:

> "The Act of Congress is highly penal. It imposes forfeiture of citizenship and deprivation of the rights of citizenship as penalties for the commission of a crime. Its avowed purpose is to add to the penalties which the law had previously affixed to the offence

[32] See p. 176, *infra.*

of desertion from the military or naval service of the United States, and it denominates the additional sanctions provided as penalties." 53 Pa., at 114–115.

It then answered the *ex post facto* argument as it had been answered on the floor of Congress, that the offense could as well be in the continued refusal to render service as in the original desertion. The second contention was met with the statement that "The enactment operates upon an individual offender, punishes him for violation of the Federal law by deprivation of his citizenship of the United States, but it leaves each state to determine for itself whether such an individual may be a voter. It does no more than increase the penalties of the law upon the commission of crime." *Id.*, at 116. "The third objection," the court continued, "would be a very grave one if the act does in reality impose pains and penalties before and without a conviction by due process of law." *Id.*, at 116–117. The court then summarized the protections guaranteed by the Fifth and Sixth Amendments, and concluded that it was not consistent with these rights to empower a "judge of elections or a board of election officers constituted under state laws . . . to adjudge the guilt or innocence of an alleged violator of the laws of the United States." *Id.*, at 117. However, the court decided that since the penalty contemplated by § 21 "is added to what the law had previously enacted to be the penalty of desertion, as imprisonment is sometimes added to punishment by fine," it must have been intended "that it should be incurred in the same way, and imposed by the same tribunal that was authorized to impose the other penalties for the offence." *Id.*, at 119. "[T]he forfeiture which it prescribes, like all other penalties for desertion, must be *adjudged* to the convicted person, after trial by a court-martial, and sentence approved. For the conviction and sentence of such a court there can be no substitute." *Id.*,

at 120. (Emphasis in original.) Accordingly, since the plaintiff had not been so convicted, the court held that he was not disenfranchised.

Subsequent state court decisions in the post-Civil War period followed *Huber* v. *Reily,* both in result and reasoning. *State* v. *Symonds,* 57 Me. 148 (1869); *Severance* v. *Healey,* 50 N. H. 448 (1870); *Gotcheus* v. *Matheson,* 58 Barb. (N. Y.) 152 (1870); *McCafferty* v. *Guyer,* 59 Pa. 109 (1868).

Ultimately and significantly, in *Kurtz* v. *Moffitt,* 115 U. S. 487, a case dealing with the question whether a city police officer had the power to arrest a military deserter, this Court recognized both the nature of the sanction imposed by § 21 and the attendant necessity of procedural safeguards, approvingly citing the above decisions:

> "The provisions of §§ 1996 and 1998, which re-enact the act of March 3, 1865, ch. 79, § 21, 13 Stat. 490, and subject every person deserting the military service of the United States to additional penalties, namely, forfeiture of all rights of citizenship, and disqualification to hold any office of trust or profit, can only take effect upon conviction by a court martial, as was clearly shown by Mr. Justice Strong, when a judge of the Supreme Court of Pennsylvania, in *Huber* v. *Reily,* 53 Penn. St. 112, and has been uniformly held by the civil courts as well as by the military authorities. *State* v. *Symonds,* 57 Maine, 148; *Severance* v. *Healey,* 50 N. H. 448; *Goetcheus* v. *Matthewson,* 61 N. Y. 420; Winthrop's Digest of Judge Advocate General's Opinions, 225." 115 U. S., at 501–502.

Section 21 remained on the books unchanged, except for being distributed in the Revised Statutes as §§ 1996 and 1998, until 1912, when Congress re-enacted it with an amendment making it inapplicable to peacetime violations

and giving the President power to mitigate or remit punishment previously imposed on peacetime violators, Act of August 22, 1912, 37 Stat. 356. The legislative history of that amendment is also instructive for our present inquiry. The discussion in both Houses had reference only to the penalties as operative on deserters, no doubt because there was no peacetime draft to evade, but since the 1865 statute dealt without distinction with both desertion and leaving the jurisdiction to evade, there is no reason to suppose the discussion quoted below to be any less applicable to the latter type of misconduct. The House Committee Report, H. R. Rep. No. 335, 62d Cong., 2d Sess. (1912), which was quoted in its entirety in the Senate Committee Report, S. Rep. No. 910, 62d Cong., 2d Sess. 3–6 (1912), stated that "In addition to the service penalty imposed by the court-martial, the law, as it now stands, imposes the further and most drastic punishment of loss of rights of citizenship . . . . There are in the United States to-day thousands of men who are literally men without a country and their numbers will be constantly added to until the drastic civil-war measure which adds this heavy penalty to an already severe punishment imposed by military law, is repealed." H. R. Rep. No. 335, *supra*, at 2. In reporting the bill out of the Committee on Naval Affairs, Representative Roberts of Massachusetts, its author, stated that "the bill now under consideration is intended to remove one of the harshest penalties that can be imposed upon a man for an offense, to wit, the loss of rights of citizenship. . . . [S]uch a drastic penalty was entirely too severe to be imposed upon an American citizen in time of peace." He detailed the penalties meted out by court-martial for desertion, and then referred to the "additional penalty of loss of citizenship," which, he concluded, is "a barbarous punishment." 48 Cong. Rec. 2903 (1912). Senator Bristow of Kansas, a member of his chamber's Committee on Military Affairs,

also referred in discussing the bill to the forfeiture of rights of citizenship as a "penalty," and said that there is no reason why a peacetime offender should be "punished so severely." 48 Cong. Rec. 9542 (1912).

A somewhat similar amendment had been passed by both Houses of Congress in 1908 but vetoed by the President.[33] The House Committee Report on that occasion, H. R. Rep. No. 1340, 60th Cong., 1st Sess. (1908), consisted mainly of a letter from the Secretary of the Navy to the Congress, and of his annual report. In both documents he referred to loss of citizenship as a "punishment," and as one of the "penalties" for desertion. Representative Roberts spoke in 1908, as he was to do once more in 1912, of the "enormity of the punishment" and the "horrible punishment," and said, "Conviction itself under

---

[33] The President's veto message to the Senate, S. Doc. No. 708, 60th Cong., 2d Sess. (1909), indicates that his refusal to approve the measure was premised partly on the fact that it placed the discretion to remit loss of citizenship rights in the Secretary of the Navy and partly on the President's feeling that it "would actually encourage hardened offenders to commit a heinous crime against the flag and the nation." *Id.*, at 2. The former was a fault of the particular form of the measure: The President was worried that power to pardon could not constitutionally be vested in anyone other than himself, and he was further disturbed that placing the power in the Secretary of the Navy would result in discrimination against army people. The President's second reason, however, indicates that to him retention of the law as it stood would serve a purpose always sought to be furthered by the imposition of punishment for crime— deterrence. This is borne out by the statements of the President's advisers in recommending that he veto it. The Secretary of War said, "Loss of citizenship is a substantial part of the punishment, and doubtless has a very considerable effect in deterring desertions." *Id.*, at 3. The Secretary of the Navy stated that "It is believed that the present law regarding the loss of citizenship as a penalty for deserters from the navy acts as a deterrent to many." *Ibid.* The Attorney General indicated his agreement with the Secretary of the Navy. *Id.*, at 5.

the existing law forfeits citizenship. That is the monstrosity of the law." 43 Cong. Rec. 111 (1908). The entire discussion, *id.*, at 110–114, was based on the premise that loss of citizenship is a punishment for desertion, the point at issue, as in 1912, being whether it was too severe a punishment for peacetime imposition. At one point Representative Roberts said, "Loss of citizenship is a punishment," to which Representative Hull of Iowa replied, "Certainly." *Id.*, at 114.

Section 504 of the Nationality Act of 1940, 54 Stat. 1172, repealed the portion of the 1865 statute which dealt with flight from the jurisdiction to avoid the draft. However, in connection with the provision governing loss of citizenship for desertion, which was enacted as § 401 (g) and declared unconstitutional in *Trop* v. *Dulles, supra,* the President's committee of advisers reported that the provisions of the 1865 Act had been "distinctly penal in character," and concluded that "They must, therefore, be construed strictly, and the penalties take effect only upon conviction by a court martial." [34] Codification of the Nationality Laws of the United States, 76th Cong., 1st Sess. 68 (Comm. Print 1939). Section 401 (g) was therefore worded so that loss of nationality could only occur upon conviction for desertion by court-martial. When, however, § 401 (j) was enacted in 1944, no such procedural safeguards were built in. See *Trop* v. *Dulles, supra,* at 93–94. Thus, whereas for JUSTICE BRENNAN concurring in *Trop* the conclusion that expatriation under § 401 (g) was punishment was "but the beginning of critical inquiry," 356 U. S., at 110, a similar conclusion with reference to §§ 401 (j) and 349 (a) (10) is sufficient to sustain the holding that they are unconstitutional.

[34] The advisers' citation of *Huber* v. *Reily, supra,* and *Kurtz* v. *Moffitt, supra,* in support of the quoted statement suggests their awareness that an underlying conviction is constitutionally mandated.

## 2. *The Present Statutes.*

The immediate legislative history of § 401 (j) confirms the conclusion, based upon study of the earlier legislative and judicial history,[35] that it is punitive in nature. The language of the section was, to begin with, quite obviously patterned on that of its predecessor, an understandable fact since the draft of the bill was submitted to the Congress by Attorney General Biddle along with a letter to Chairman Russell of the Senate Immigration Committee, in which the Attorney General referred for precedent to the 1912 reenactment of the 1865 statute. This letter, which was the impetus for the enactment of the bill, was quoted in full text in support of it in both the House and Senate Committee Reports, H. R. Rep. No. 1229, 78th Cong., 2d Sess. 2–3 (1944); S. Rep. No. 1075, 78th Cong., 2d Sess. 2 (1944), and is set out in the margin.[36] The

---

[35] The relevance of such history in analyzing the character of a present enactment is illustrated by the Court's approach in *Helwig* v. *United States,* 188 U. S. 605, 613–619, wherein at considerable length it reviewed and relied upon the character of previous relevant legislation in determining whether the statute before it, which imposed an exaction upon importers who undervalued imported goods for duty purposes, was a penalty.

[36] "MY DEAR SENATOR: I invite your attention to the desirability of enacting legislation which would provide (1) for the expatriation of citizens of the United States who in time of war or during a national emergency leave the United States or remain outside thereof for the purpose of evading service in the armed forces of the United States, and (2) for the exclusion from the United States of aliens who leave this country for the above mentioned purpose.

"Under existing law a national of the United States, whether by birth or by naturalization, becomes expatriated by operation of law if he (1) obtains naturalization in a foreign state; (2) takes an oath of allegiance to a foreign country; (3) serves in the armed forces of a foreign state if he thereby acquires the nationality of such foreign state; (4) accepts employment under a foreign state for which only

Senate Report stated that it "fully explains the purpose of the bill." S. Rep. No. 1075, *supra,* at 1. The letter was couched entirely in terms of an argument that citizens who had left the country in order to escape military serv-

nationals of such state are eligible; (5) votes in a political election in a foreign state or participates in an election or plebiscite to determine the sovereignty over foreign territory; (6) makes a formal renunciation of nationality before a diplomatic or consular officer of the United States in a foreign state; (7) deserts from the armed forces of the United States in time of war and is convicted thereof by a court martial; or (8) is convicted of treason (U. S. C., title 8, sec. 801). Machinery is provided whereby a person who is denied any right or privilege of citizenship on the ground that he has become expatriated may secure a judicial determination of his status; and if he is outside of the United States he is entitled to a certificate of identity which permits him to enter and remain in the United States until his status has been determined by the courts (Nationality Act of 1940, sec. 503; U. S. C., title 8, sec. 903).

"The files of this Department disclose that at the present time there are many citizens of the United States who have left this country for the purpose of escaping service in the armed forces. While such persons are liable to prosecution for violation of the Selective Service and Training Act of 1940, if and when they return to this country, it would seem proper that in addition they should lose their United States citizenship. Persons who are unwilling to perform their duty to their country and abandon it during its time of need are much less worthy of citizenship than are persons who become expatriated on any of the existing grounds.

"Accordingly, I recommend the enactment of legislation which would provide (1) for the expatriation of citizens of the United States who in time of war or during a national emergency leave the United States or remain outside thereof for the purpose of evading service in the armed forces of the United States, and (2) for the exclusion from the United States of aliens who leave this country for that purpose. Any person who may be deemed to have become expatriated by operation of the foregoing provision, would be entitled to have his status determined by the courts pursuant to the above-mentioned section of the Nationality Act of 1940.

"Adequate precedent exists for the suggested legislation in that during the First World War a statute was in force which provided

182

ice should be dealt with, and that loss of citizenship was a proper way to deal with them. There was no reference to the societal good that would be wrought by the legislation, nor to any improvement in soldier morale or in the conduct of war generally that would be gained by the passage of the statute. The House Committee Report and the sponsors of the bill endorsed it on the same basis. The report referred for support to the fact that the FBI files showed "over 800 draft delinquents" in the El Paso area alone who had crossed to Mexico to evade the draft. H. R. Rep. No. 1229, *supra,* at 2. The obvious inference to be drawn from the report, the example it contained, and the lack of mention of any broader purpose is that Congress was concerned solely with inflicting effective retribution upon this class of draft evaders and, no doubt, on others similarly situated. Thus, on the floor of the House, Representative Dickstein of New York, the Chairman of the House Committee on Immigration and Naturalization, explained the bill solely as a means of dealing with "draft dodgers who left this country knowing that there was a possibility that they might be drafted in this war and that they might have to serve in the armed forces . . . ." He implied that the bill was necessary to frustrate their "idea of evading military service and of returning after the war is over, and taking their old places

for the expatriation of any person who went beyond the limits of the United States with intent to avoid any draft into the military or naval service (37 Stat. 356). This provision was repealed by section 504 of the Nationality Code of 1940 (54 Stat. 1172; U. S. C., title 8, sec. 904).

"A draft of a proposed bill to effectuate the foregoing purpose is enclosed herewith.

"I have been informed by the Director of the Bureau of the Budget that the proposed legislation is in accord with the program of the President.

"Sincerely yours,
"ATTORNEY GENERAL."

in our society." 90 Cong. Rec. 3261 (1944). Senator Russell, who was manager of the bill as well as Chairman of the Senate Immigration Committee, explained it in similar terms:

> "Certainly those who, having enjoyed the advantages of living in the United States, were unwilling to serve their country or subject themselves to the Selective Service Act, should be penalized in some measure. . . . Any American citizen who is convicted of violating the Selective Service Act loses his citizenship. This bill would merely impose a similar penalty on those who are not subject to the jurisdiction of our courts, the penalty being the same as would result in the case of those who are subject to the jurisdiction of our courts." 90 Cong. Rec. 7629 (1944).[37]

The Senate and House debates, together with Attorney General Biddle's letter, brought to light no alternative purpose to differentiate the new statute from its predecessor. Indeed, as indicated, the Attorney General's letter specifically relied on the predecessor statute as precedent for this enactment, and both the letter and the debates, consistent with the character of the predecessor statute, referred to reasons for the enactment of the bill which were fundamentally retributive in nature. When all of these considerations are weighed, as they must be, in the context of the incontestibly punitive nature of the predecessor statute, the conclusion that § 401 (j) was itself dominantly punitive becomes inescapable. The legislative history of § 349 (a)(10) of the Immigration and Nationality Act of 1952, which re-enacted § 401 (j), adds

---

[37] The Senator's statement that "Any American citizen who is convicted of violating the Selective Service Act loses his citizenship" was apparently a reference to § 401 (g), and should accordingly be read in that limited fashion.

nothing to disturb that result.[38] Our conclusion from the legislative and judicial history is, therefore, that Congress in these sections decreed an additional punishment for the crime of draft avoidance in the special category of cases wherein the evader leaves the country. It cannot do this without providing the safeguards which must attend a criminal prosecution.[39]

## V. Conclusion.

It is argued that our holding today will have the unfortunate result of immunizing the draft evader who has left the United States from having to suffer any sanction against his conduct, since he must return to this country before he can be apprehended and tried for his crime. The compelling answer to this is that the Bill of Rights which we guard so jealously and the procedures it guarantees are not to be abrogated merely because a guilty man may escape prosecution or for any other expedient reason. Moreover, the truth is that even without being expatriated, the evader living abroad is not in a position to assert the vast majority of his component rights as an American citizen. If he wishes to assert those rights in any real sense he must return to this country, and by doing that he will subject himself to prosecution. In fact,

---

[38] Section 349 (a) (10) did amend § 401 (j) by adding a presumption that failure to comply with any provision of the compulsory service laws of the United States means that the departure from or absence from the United States is for the purpose of avoiding military service. See note 1, *supra*. Our holding today obviates any necessity for passing upon this provision.

[39] *Lipke* v. *Lederer*, 259 U. S. 557; *United States* v. *La Franca*, 282 U. S. 568. See *Ex parte Wilson*, 114 U. S. 417; *Mackin* v. *United States*, 117 U. S. 348; *Wong Wing* v. *United States*, 163 U. S. 228. Compare *Wieman* v. *Updegraff*, 344 U. S. 183; *Slochower* v. *Board of Higher Education*, 350 U. S. 551, 554, 556; *Speiser* v. *Randall*, 357 U. S. 513.

while he is outside the country evading prosecution, the United States may, by proper refusal to exercise its largely discretionary power to afford him diplomatic protection,[40] decline to invoke its sovereign power on his behalf. Since the substantial benefits of American citizenship only come into play upon return to face prosecution, the draft evader who wishes to exercise his citizenship rights will inevitably come home and pay his debt, which within constitutional limits Congress has the power to define. This is what Mendoza-Martinez did, what Cort says he is willing to do, and what others have done.[41] Thus our holding today does not frustrate the effective handling of the problem of draft evaders who leave the United States.[42]

[40] Borchard, Diplomatic Protection of Citizens Abroad (1916), §§ 143, 341; see authorities cited in Klubock, Expatriation—Its Origin and Meaning, 38 Notre Dame Law. 1, 11, n. 68 (1962). See also *Blackmer* v. *United States,* 284 U. S. 421.

[41] The astonishing story of Grover Cleveland Bergdoll is one example. See, *e. g.,* N. Y. Times, Sept. 23, 1927, p. 8, col. 3; May 3, 1935, p. 3, col. 4; Aug. 16, 1935, p. 9, col. 3; Apr. 11, 1939, p. 6, col. 4; May 26, 1939, p. 1, col. 7; May 30, 1939, p. 36, col. 4; Oct. 6, 1939, p. 1, col. 3; Dec. 5, 1939, p. 3, col. 6; 39 Op. Atty. Gen. 303 (1939). Another example is the recent voluntary return of Edward M. Gilbert to face trial on charges for which he could not be extradited. N. Y. Times, Oct 27, 1962, p. 1, col. 1; Oct. 30, 1962, p. 1, col. 2.

[42] Moreover, the problem is, relatively, extremely small. Over 16,000,000 men served in our armed forces during World War II, and nearly 6,000,000 more served during the Korean crisis. The World Almanac (1963), 735. Yet between the time of the enactment of § 401 (j) and June 30, 1961, only about 1,750 persons were denationalized for leaving the country to avoid the draft. Compare figures cited in Klubock, *supra,* at 49, taken from Immigration and Naturalization Service Annual Reports, with figures cited in Comment, The Expatriation Act of 1954, 64 Yale L. J. 1164, 1165, n. 9 (1955), derived partially from correspondence with the General Counsel to the Immigration and Naturalization Service.

We conclude, for the reasons stated, that §§ 401 (j) and 349 (a)(10) are punitive and as such cannot constitutionally stand, lacking as they do the procedural safeguards which the Constitution commands.[43]   We recognize that draft evasion, particularly in time of war, is a heinous offense, and should and can be properly punished. Dating back to Magna Carta, however, it has been an abiding principle governing the lives of civilized men that "no freeman shall be taken or imprisoned or disseised or outlawed or exiled . . . without the judgment of his peers or by the law of the land . . . ."[44]   What we hold is only that, in keeping with this cherished tradition, punishment cannot be imposed "without due process of law."   Any lesser holding would ignore the constitutional mandate upon which our essential liberties depend.   Therefore the judgments of the District Courts in these cases are

*Affirmed.*

MR. JUSTICE DOUGLAS and MR. JUSTICE BLACK, while joining the opinion of the Court, adhere to the views expressed in the dissent of MR. JUSTICE DOUGLAS, in which MR. JUSTICE BLACK joined, in *Perez* v. *Brownell*, 356 U. S. 44, 79, that Congress has no power to deprive a person of the citizenship granted the native-born by § 1, cl. 1, of the Fourteenth Amendment.

---

[43] The conclusion that the denationalization sanction, as used in §§ 401 (j) and 349 (a)(10), is a punishment, obviates any need to determine whether these sections are otherwise within the powers of Congress.   That question would have had to be faced only if the foregoing inquiry had disclosed reasons other than punitive for the infliction of loss of nationality in the present context, necessitating decision whether the sections in question were within the powers of Congress as a regulatory scheme, or if the punitive forfeiture of citizenship had been surrounded with appopriate safeguards, obliging decision whether the sections were within the powers of Congress to apply as a criminal sanction.

[44] 14 Encyclopaedia Britannica (1957 ed.) 630.

MR. JUSTICE BRENNAN, concurring.

I join the Court's opinion because I fully agree with the Court's conclusion that Congress has here attempted to employ expatriation as a penal sanction in respect of behavior deemed inimical to an objective whose pursuit is within its assigned powers, and with the reasoning by which that conclusion is reached. So too, I agree that Congress is constitutionally debarred from so employing the drastic, the truly terrifying remedy of expatriation, certainly where no attempt has been made to apply the full panoply of protective safeguards which the Constitution requires as a condition of imposing penal sanctions. However, I deem it appropriate to elaborate somewhat the considerations which impel me to agree with the Court.

This Court has never granted. the existence in Congress of the power to expatriate except where its exercise was intrinsically and peculiarly appropriate to the solution of serious problems .inevitably implicating nationality. We have recognized the entanglements which may stem from dual allegiance, and have twice sustained statutes which provided for loss of American citizenship upon the deliberate assumption of a foreign attachment. *Mackenzie* v. *Hare,* 239 U. S. 299; *Savorgnan* v. *United States,* 338 U. S. 491. We have recognized that participation by American nationals in the internal politics of foreign states could dangerously prejudice our diplomacy, and have allowed the use of expatriation as a uniquely potent corrective which precludes recriminations by disowning, at the moment of his provocative act, him who might otherwise be taken as our spokesman or our operative. *Perez* v. *Brownell,* 356 U. S. 44. The instant cases do not require me to resolve some felt doubts of the correctness of *Perez,* which I joined. For the Court has never held that expatriation was to be found in Congress'

arsenal of common sanctions, available for no higher pur-
pose than to curb undesirable conduct, to exact retribution
for it, and to stigmatize it.

## I.

In *Trop* v. *Dulles*, 356 U. S. 86, we had before us
§ 401 (g) of the Nationality Act of 1940, which imposed
loss of American nationality following conviction of
deserting the armed forces in time of war. We held that
statute unconstitutional. Three of my Brethren joined
in the opinion of THE CHIEF JUSTICE, who analyzed the
case in terms equally applicable to the cases at bar. That
plurality opinion in *Trop* noted that the congressional
power to which expatriation under § 401 (g) was said to
be relevant was the "war power." It concluded that
expatriation under § 401 (g) could have no value in fur-
therance of the war power except as a sanction, to deter
or punish desertion; that expatriation so employed was
"punishment" within the meaning of the Eighth Amend-
ment; and that such punishment was unconstitutional
because cruel and unusual.[1]

My concurring views in *Trop*, separately expressed,
were akin to those of the plurality. I shared the view
that expatriation could have been employed in § 401 (g)
only as a sanction, and I considered this an insuffi-
cient predicate for its use—which I believed allowable
only where some affirmative and unique relationship to
policy was apparent. My premise was the simple and
fundamental one that legislation so profoundly destruc-
tive of individual rights must keep within the limits

---

[1] The plurality opinion in *Trop* rested alternatively on the propo-
sition that divestiture of citizenship can result only from a clear renun-
ciation or transfer of allegiance on the part of the citizen. However,
since this view had been rejected by a majority of the Court in *Perez*
v. *Brownell, supra,* the *Trop* plurality relied principally on the rea-
soning outlined in the text.

of palpable reason and rest upon some modicum of discoverable necessity. I was unable to conclude that § 401 (g) met that elementary test. It was evident that recognizable achievement of legitimate congressional purposes through the expatriation device was at best remote; and that far more promising alternative methods existed and had, in fact, been employed.

My Brother STEWART attempts to distinguish *Trop* along two fronts: He argues that expatriation is not here employed as "punishment" in the constitutional sense so that the reasoning of the *Trop* plurality has no application; and he argues that, the question of punishment aside, expatriation as here employed is a uniquely necessary device not falling within the rationale of my views separately expressed in *Trop*.

My Brother STEWART discerns in § 401 (j) [2] an affirmative instrument of policy and not simply a sanction which must be classed as "punishment." The policy objective is thought to be the maintenance of troop morale; a threat to that objective is thought to be the spectacle of persons escaping a military-service obligation by flight; and expatriation of such persons is sustained as a demonstrative counter to that threat. To my mind that would be "punishment" in the purest sense; it would be naked vengeance. Such an exaction of retribution would not lose that quality because it was undertaken to maintain morale. Indeed, it is only the significance of expatriation as retribution which could render it effective to boost morale—the purpose which, to the dissent, removes expatriation as here used from the realm of the punitive. I do not perceive how expatriation so employed would differ analytically from the stocks or the rack. Because

---

[2] My discussion of § 401 (j) is equally applicable to its re-enactment as § 349 (a)(10) of the Immigration and Nationality Act of 1952, involved in the *Cort* case.

such devices may be calculated to shore up the convictions of the law-abiding by demonstrating that the wicked will not go unscathed, they would not, by the dissent's view, be punitive or, presumably, reachable by the Eighth Amendment.[3] I cannot agree to any such proposition, and I see no escape from the conclusion that § 401 (j), before us today, is identical in purpose to § 401 (g) and is quite as "punitive" as was that statute, which we condemned in *Trop.*

The dissent finds other distinctions between this case and *Trop,* quite apart from its untenable position that § 401 (j) is not punitive. It is said that flight from the country to escape the draft, in contrast with desertion, could never be a mere technical offense equivocal in its implications for the loyalty of the offender. But the unshakable fear of physical stress or harm, the intellectual or moral aversion to combat, and the mental aberration which may result in flight are no more inconsistent with underlying loyalty than was Trop's unauthorized abandonment of his post.[4] Again, it is suggested that the

---

[3] The examples I have given must, of course, have some deterrent effect upon the conduct for which they are administered. But this could not, in the dissent's view, render them punitive. For expatriation as employed in § 401 (j) must also, in the dissent's view, have some deterrent effect upon draft-evading flight, since if expatriation were not thought by the dissent to be an undesirable consequence, it could not serve the morale-boosting purpose which is attributed to it. (But see pp. 192–193 and n. 6, *infra.*) And, as the dissent recognizes, the legislative purpose was at least in part a deterrent one.

[4] The "purpose of evading or avoiding training and service" specified in § 401 (j) seems no graver a reflection upon loyalty than the "intent to remain away . . . permanently" or the "intent to avoid hazardous duty or to shirk important service" specified in the definition of desertion codified in the Uniform Code of Military Justice, 10 U. S. C. § 885. The mere fact that the conduct described in § 401 (j) requires the crossing of a frontier does not guarantee that it will be

element of cumulation of punishments which helped expose the futility of expatriation in *Trop* is missing here, because § 401 (j), unlike § 401 (g), becomes operative without a prior conviction, and applies only in the case of flight beyond our borders. But the *Mendoza-Martinez* case, in its collateral estoppel issue, prominently displays what would in any case be obvious—that expatriation under § 401 (j) *is* cumulative with criminal sanctions for draft evasion, for those sanctions apply to fugitives equally as much as to sedentary violators.[5]

Nor can *Trop* rationally be distinguished on the ground that the application of § 401 (j) *only* to fugitives proves that it was designed to fill a void necessarily left by the ordinary criminal draft-evasion sanctions. The point, as I understand it, is that the ordinary sanctions cannot be brought to bear against a fugitive who declines to come home; but he can be expatriated while he remains abroad, without having to be brought before a tribunal and formally proceeded against. The special virtue of expatriation, it appears, is that it may be accomplished *in absentia*.

---

any less equivocal or more serious than was Trop's desertion. A resident of Texas might, during time of war, cross the border into Mexico intending to evade the draft, then change his mind and return the next day. Such conduct clearly results in expatriation under § 401 (j).

[5] It is obvious that § 401 (j) does not reach any conduct not otherwise made criminal by the selective service laws. 62 Stat. 622, 50 U. S. C. App. § 462 (a), in relevant part identical with Selective Training and Service Act of 1940, § 11, under which Mendoza-Martinez was prosecuted, provides: "[A]ny person who . . . evades or refuses registration or service in the armed forces or any of the requirements of this title . . . , or who in any manner shall knowingly fail or neglect or refuse to perform any duty required of him under or in the execution of this title . . . , or rules, regulations, or directions made pursuant to this title . . . , shall, upon conviction in any district court of the United States of competent jurisdiction, be punished by imprisonment for not more than five years or a fine of not more than $10,000, or by both such fine and imprisonment . . . ."

Aside from the denial of procedural due process, which the Court rightly finds in the scheme, the surface appeal of the argument vanishes upon closer scrutiny.

It simply is not true that expatriation provides an instrumentality specially necessary for imposing the congressional will upon fugitive draft evaders. Our statutes now provide severe criminal sanctions for the behavior in question. The fugitive can return only at the cost of suffering these punishments; the only way to avoid them is to remain away. As to any draft delinquent for whom the prospect of this dilemma would not itself pose a recognizable, formidable deterrent, I fail to see how the addition of expatriation could enhance the effect at all.[6] Nor can expatriation affect the fugitive who will not return to be punished—for whom it is thought to be specially designed. For that individual has, *ex hypothesi*, determined on his own to stay away and so cannot be affected by the withdrawal of his right to return. The sting of the measure is felt only by those like Mendoza-Martinez, who have already returned and been punished, and those like Cort, who desire to return and be punished—those, in other words, as to whom expatriation is patently cumulative with other sanctions. As to the unregenerate fugitive whom it is particularly thought to reach, expatriation is but a display of congressional displeasure. I cannot agree that it is within the power of Congress so to express its displeasure with those who will

---

[6] The prospective fugitive draft evader must consider that if he flees, either (1) he must eventually face criminal fine and imprisonment; or (2) he will not be able to return. To say that prospect (1) will not deter is simply to reject our entire criminal justice as fruitless so far as deterrence is an object. To say that prospect (2) will not deter is simply to concede that expatriation will not deter, either—except on the strained assumption that withdrawal of diplomatic protection can work the difference.

not return as to destroy the rights and the status of those who have demonstrated their underlying attachment to this country by coming home.

It is apparent, then, that today's cases are governed by *Trop* no matter which of the two controlling opinions is consulted. Expatriation is here employed as "punishment," cruel and unusual here if it was there. Nor has expatriation as employed in these cases any more rational or necessary a connection with the war power than it had in *Trop*.

## II.

MR. JUSTICE STEWART's dissent would sustain § 401 (j) as a permissible exercise of the "war power." The appellants in these cases, on the other hand, place their main reliance on the "foreign affairs power." The dissent summarizes the appellants' arguments under this heading but does not purport to pass on them. Because of my conviction that § 401 (j) is unconstitutional no matter what congressional power is invoked in its support, I find it necessary to deal with the foreign affairs arguments advanced by the appellants.

Initially, I note that the legislative history as expounded by the dissent fails to reveal that Congress was mindful of any foreign affairs problem to be corrected by the statute. The primary purpose seems to me to have been retributive, the secondary purpose deterrent; and even the morale-boosting purpose discerned by the dissent has nothing to do with foreign affairs. While the obvious fact that Congress was not consciously pursuing any foreign affairs objective may not necessarily preclude reliance on that power as a ground of constitutionality, it does render such reliance initially questionable.

Proceeding to the appellants' arguments, one encounters first the suggestion that a fugitive draft evader "can easily cause international complications" while he remains

an American citizen, because the United States cannot exercise control over him while he is on foreign soil.

Such a "problem," obviously, exists equally with respect to any fugitive from American justice, and cannot be thought confined to draft evaders. Yet it is only fugitive draft evaders who are expatriated. It is, therefore, impossible to agree that Congress was acting on any such inherently unlikely premise as that expatriation was necessary so as to avoid responsibility for those described by § 401 (j).

But, contend the appellants, § 401 (j) is designed to prevent embroilments as well as embarrassments. During wartime, it is argued, our Government would very likely feel impelled to demand of foreign havens the return of our fugitive draft evaders; and such a demand might seriously offend a "host" country, leading to embroilment. The transparent weakness of this argument—its manifest inconsistency—must be immediately apparent. Surely the United States need not disable itself from making injudicious demands in order to restrain itself from doing so. The argument rests on the possibility that there may be an urgent need to secure a fugitive's return. If that is so, a demand must be made with its attendant risk of embroilment. If expatriating the fugitive makes a demand impossible, it also forever defeats the objective— his return—which would have impelled the demand in the first place. If recapturing fugitives may ever be urgently necessary, it is obvious that automatic expatriation could only be directly opposed to our interest—which requires that the Government be free to choose whether or not to make the demand, in light of all the attendant circumstances.

The appellants have still another argument. It is that whereas the Government is under an obligation to seek the return of the fugitive as long as he remains a citizen, by terminating citizenship "Congress has eliminated at

the outset any further claim that this country would have to the services of these individuals, and has removed all basis for further demands upon them . . . ." This simply is not so. Expatriation may have no effect on a continuing military-service obligation.[7] And it is incontrovertible that the power to punish the initial draft-evasion offense continues although citizenship has meanwhile become forfeit. The Government has so argued in addressing itself to the collateral estoppel issue in *Mendoza-Martinez*. I cannot understand how any obligation to apprehend can be other than coextensive with the power to punish. The Government cannot have it both ways in the same case.

## III.

The appellants urge that, wholly apart from any explicit congressional power, § 401 (j) may be sustained as an exercise of a power inherent in United States sovereignty. My Brethren who would uphold the statute have not adverted to this possibility except, as I shall point out, as they have adopted in passing certain related arguments.

Preliminarily, it is difficult to see what is resolved by the assertion that sovereignty implies a power to expatriate. That proposition may be admitted and yet have no bearing on the problem facing the Court.

For, under our Constitution, only a delimited portion of sovereignty has been assigned to the Government of

---

[7] As the Government forcefully argues on the collateral estoppel point in *Mendoza-Martinez*, the selective service requirements apply to resident aliens as well as to citizens. Section 401 (j), as discussed in Congress and by the appellants and in Mr. Justice Stewart's dissent in these cases, seems to reflect a special concern with those who flee "for the duration," intending to return after peace is restored. The Government could well argue that such a fugitive, although expatriated, is a resident alien subject to compulsory military service.

which Congress is the legislative arm. To say that there inheres in United States sovereignty the power to sever the tie of citizenship does not answer the inquiry into whether that power has been granted to Congress. Any argument that it has been so delegated which eschews reference to the constitutional text must, it appears, make its appeal to some sense of the inevitable fitness of things. The contentions here fall far short of any such standard.

It is too simple to suggest that it is fitting that Congress be empowered either to extinguish the citizenship of one who refuses to perform the "ultimate duty" of rising to the Government's defense in time of crisis. I pause to note that for this Court to lend any credence whatever to such a criterion—as the dissent would, see pp. 214–215, *infra*—is fraught with the most far-reaching consequences. For if Congress now should declare that a refusal to pay taxes, to do jury duty, to testify, to vote, is no less an abnegation of ultimate duty—or an implied renunciation of allegiance—than a refusal to perform military service, I am unable to perceive how this Court, on the dissent's view, could presume to gainsay such a judgment. But the argument is not saved even by a willingness to accept these consequences. There really is no way to distinguish between the several failures of a citizen's duty I have just enumerated, or to explain why evasion of military service should be visited with this specially harsh consequence, except to recognize that the latter defection is palpably more provocative than the others. But, as I have argued in another context, when conduct is singled out of a class for specially adverse treatment simply because it is specially provocative, there is no escaping the conclusion that punishment is being administered. See *Flemming v. Nestor,* 363 U. S. 603, 635–640 (dissenting opinion). Pursuit of the "ultimate duty" concept, then, simply reaffirms my conviction that this case is indistinguishable from *Trop.*

The appellants, however, argue that it is fitting that Congress be empowered to extinguish the citizenship of one who not only refuses to perform his duty, but who also "repudiates his wider obligation as a citizen to submit to this country's jurisdiction and authority" by fleeing the country in order to escape that duty. It is, once again, difficult to see how this flight-repudiation theory can be confined to draft evasion. Every fugitive from United States justice repudiates American authority over him in equal measure. If the difference lies in the quality of the act of draft evasion, then we are back once again to punishment.

The appellants assert that "[a] government which cannot exert force to compel a citizen to perform his *lawful* [Government's emphasis] duty is, to that extent, not sovereign as to him." The apparent corollary is that congressionally imposed expatriation is, under such circumstances, in effect declaratory of a change in status which has already occurred. But the Government is far from conceding its lack of authority over a fugitive draft evader. It informs us that "the federal government has the power to order our citizens abroad to return, for any lawful purpose," citing *Blackmer* v. *United States,* 284 U. S. 421. And, in any event, the argument proves far too much, for it would justify expatriation of any American abroad for any reason who would, equally with persons covered by § 401 (j), be outside our Government's power to compel the performance of duty.

MR. JUSTICE HARLAN, whom MR. JUSTICE CLARK joins, dissenting.

I agree with and join in Parts I, II, III, and IV of my Brother STEWART's opinion, leading to the conclusion that § 401 (j) of the Nationality Act of 1940, applicable in No. 2 (*Mendoza*), is constitutional. I also agree with his conclusion that, for the same reasons, the substantive

provisions of § 349 (a)(10) of the 1952 Act, applicable in
No. 3 (*Cort*), are constitutional. I disagree, however,
with his view that the evidentiary presumption contained
in § 349 (a)(10) is unconstitutional. I am content to
state my reasons in summary form.

1. As I read the opinion below in the *Cort* case I do
not think the District Court relied on the § 349 (a)(10)
presumption.[1] This view is fortified by several consid-
erations: (i) the constitutionality of the presumption was
attacked in Cort's complaint and was briefed by both sides
in the District Court; (ii) the text of the presumption
itself was set forth in the opinion of the District Court
(187 F. Supp., at 684) at only a page or two before the
extract quoted in the margin (note 1); and (iii) in these

---

[1] The District Court said: "When, as here, a citizenship claimant
establishes his birth in the United States the burden is upon the Gov-
ernment to prove by clear, convincing and unequivocal evidence the
act it relies upon to show expatriation. Nishikawa v. Dulles, 356
U. S. 129, 133 . . . . We think the Government has met this burden.
In 1951 when the plaintiff went abroad it was for a limited period.
On December 29, 1952, he accepted a position at the Harvard Medical
School to begin the latter part of 1953, and indicated that he had
made arrangements for prior transportation to the United States.
His intention to return to this country was steadfast until he learned
shortly after January 31, 1953, that the school authorities felt that
they could not declare him 'essential' for teaching, and that he prob-
ably would be drafted. He wrote them on February 10, 1953, that
until he heard 'something definite' from the draft board he was
'reluctant to take a decision that may prove to be foolish or pre-
mature.' On February 9, June 4, and July 3 in 1953 the draft board
sent him notices to report for physical examination, and thereafter
ordered him to report for induction on September 14, 1953. The
plaintiff made no response or compliance but remained abroad. We
are convinced that his purpose was to avoid service in the armed
forces.

"The only question left in this case is the constitutionality of the
law under which the Government maintains that the plaintiff was
divested of his citizenship." 187 F. Supp., at 686.

circumstances it is difficult to believe that the lower court, composed of three experienced judges, either inadvertently ignored the presumption or upheld its validity *sub silentio*. The more likely conclusion is that finding the evidence sufficient without the aid of the presumption, the lower court saw no need for reaching a second constitutional issue.

So viewing the District Court's opinion, I think the evidence was quite sufficient under the "clear, unequivocal, and convincing" standard of *Schneiderman* v. *United States*, 320 U. S. 118, 135, to support the finding below that Cort had remained abroad for the purpose of evading military service.[2]

---

[2] Cort was not charged with going abroad in order to avoid military service, but solely with remaining abroad to avoid induction. The evidence shows convincingly that Cort's purpose in remaining abroad, first in England and then in Czechoslovakia, was to avoid the draft.

On May 29, 1951, Cort left the United States to accept a research fellowship at the University of Cambridge, England. A few days before his departure he registered as a "special registrant" under the Doctors Draft Act. On September 11, 1952, he was classified I–A (medical), available for military service. Meanwhile, in late 1951 the Government had requested Cort to surrender his passport for invalidation, except for return to the United States. He did not do this.

On December 29, 1952, Cort accepted, by a letter sent from England, a teaching position at the Harvard Medical School, indicating his intention to return to the United States in late June 1953 in order to start work on August 1, 1953. On the same day he also wrote to the Massachusetts Medical Advisory Committee, stating that he would begin teaching at Harvard in July 1953, and requesting a draft deferment on the ground that this "civilian function . . . shall be far more essential to my country than military service."

On January 29, 1953, Harvard authorities advised the Medical Advisory Committee that they did not regard Cort's teaching position as essential to medical teaching, and on February 4, 1953, the Committee recommended to the local draft board that Cort be considered

200

2. In addition, I see nothing constitutionally wrong with this presumption either on its face or as related to this case. Similar presumptions have been consistently sustained in criminal statutes, where the standard of proof is certainly no less stringent than in denationalization cases. See, *e. g., Yee Hem* v. *United States,* 268 U. S. 178; *Casey* v. *United States,* 276 U. S. 413; *Hawes* v. *Georgia,* 258 U. S. 1; cf. *Fong Yue Ting* v. *United States,* 149 U. S. 698. As regards the requirement that there must be a "rational connection between the fact proved and the ultimate fact presumed," *Tot* v. *United States,* 319 U. S. 463, 467, this presumption is surely a far cry

"available for active military service." Between January 31, 1953, and May 29, 1953, the Dean of the Harvard Medical School and Cort exchanged several letters—the Dean suggesting that Cort apply for a commission, Cort expressing surprise that the teaching position was not considered essential, and that until he had heard from his draft board he was "reluctant to take a decision that may prove to be foolish or premature."

On February 9, 1953, Cort was informed by his local draft board that his deferment request had been denied, and he was ordered to report for a physical examination within 30 days of the receipt of the letter. On June 4, 1953, and on July 3, 1953, he was again sent notices directing him to report for a physical examination. On August 13, 1953, Cort was ordered to report for induction on September 14, 1953. Cort did not report notwithstanding that in the interval, as he concedes, he had received these notices from his draft board.

On August 8, 1954, after his residence permit in England was not renewed by the British Home Office, Cort took up residence in Prague, Czechoslovakia, where not until *April 7, 1959,* did he make any application for a United States passport.

Against this background the District Court was certainly entitled to discredit Cort's belated efforts, long after his indictment for draft evasion, to come to terms with the military authorities, as well as his self-serving statements that he remained abroad to avoid investigation as to his alleged Communist affiliations or possible prosecution under the Smith Act.

from that held constitutionally invalid in the *Tot* case.[3]
And since we are concerned here only with the presump-
tion as applied in *this* instance (if indeed it was in fact
applied below or must now be resorted to in this Court),
it is no answer to suggest that in *other* instances appli-
cation of the presumption might be unconstitutional.

Thus whether or not the § 349 (a)(10) presumption is
involved in the *Cort* case, I believe that the order of
denationalization there, as well as in the *Mendoza* case,
should be upheld.[4]

MR. JUSTICE STEWART, with whom MR. JUSTICE WHITE
joins, dissenting.

The Court's opinion is lengthy, but its thesis is simple:
(1) The withdrawal of citizenship which these statutes
provide is "punishment." (2) Punishment cannot con-
stitutionally be imposed except after a criminal trial and
conviction. (3) The statutes are therefore unconstitu-

---

[3] A presumption that one is remaining abroad with a purpose of
avoiding military service, arising from continued sojourn abroad in
the face of an uncontroverted call to military duty, certainly bears
no resemblance whatever to the presumption found wanting in *Tot*.
That presumption was that firearms or ammunition possessed by one
previously convicted of a crime of violence, or who was a fugitive
from justice, were received not only in interstate commerce, but also
subsequent to the enactment of the relevant statute, the presumption
arising solely from a showing that such person had already once been
convicted of a crime of violence and was presently in possession of
firearms or ammunition.

[4] Even on the premises of my Brother STEWART, the proper course
would be to remand the *Cort* case to the District Court for a new
trial, not, as he proposes, to set aside the basic denationalization pro-
ceeding. This is not a case of the District Court being called on
simply to review for error an administrative record, but one in which
it was required to try the denationalization issue *de novo*. In these
circumstances there would be no need to have the administrative
proceeding start all over again.

tional. As with all syllogisms, the conclusion is inescapable if the premises are correct. But I cannot agree with the Court's major premise—that the divestiture of citizenship which these statutes prescribe is punishment in the constitutional sense of that term.[1]

## I.

Despite the broad sweep of some of the language of its opinion, the Court as I understand it does not hold that involuntary deprivation of citizenship is inherently and always a penal sanction—requiring the safeguards of a criminal trial. Such a determination would overrule at least three decisive precedents in this Court.

Nearly 50 years ago the Court held that Congress had constitutional power to denationalize a native-born citizen who married a foreigner but continued to reside here. *Mackenzie* v. *Hare,* 239 U. S. 299. The Court there explicitly rejected the argument "that the citizenship of plaintiff was an incident to her birth in the United States, and, under the Constitution and laws of the United States, it became a right, privilege and immunity which could not be taken away from her except as a punishment for crime or by her voluntary expatriation." 239 U. S., at 308. The power of Congress to denationalize a native-born citizen, without a criminal trial, was reaffirmed in *Savorgnan* v. *United States,* 338 U. S. 491. And less than five years ago, in *Perez* v. *Brownell,* 356 U. S. 44, the Court again upheld this congressional power in an opinion which unambiguously rejected the notion, advanced in

---

[1] The statute involved in No. 2, *Kennedy* v. *Mendoza-Martinez,* is § 401 (j) of the Nationality Act of 1940, as amended, 58 Stat. 746. The statute involved in No. 3, *Rusk* v. *Cort,* is § 349 (a) (10) of the Immigration and Nationality Act of 1952, 8 U. S. C. § 1481 (a) (10). The substantive provisions of these statutes are practically identical. I agree with the Court that the jurisdictional objection and the claims of collateral estoppel in No. 2 are without merit, and that the constitutional validity of both statutes must therefore be determined.

that case by the dissenters,[2] that the *Mackenzie* and *Savorgnan* decisions stand only for the proposition that citizenship may be *voluntarily* relinquished or abandoned either expressly or by conduct. In short, it has been established for almost 50 years that Congress under some circumstances may, without providing for a criminal trial, make expatriation the consequence of the voluntary conduct of a United States citizen, irrespective of the citizen's subjective intention to renounce his nationality, and irrespective too of his awareness that denationalization will be the result of his conduct.[3]

## II.

The position taken by the Court today is simply that, unlike the statutes involved in *Mackenzie, Savorgnan* and *Perez,* the statutes at issue in the present case employ deprivation of citizenship as a penal sanction. In support of this position, the Court devotes many pages of its opinion to a discussion of a quite different law, enacted in 1865, amended in 1912, and repealed in 1940. That law [4] provided for forfeiture of the "rights of citizenship" as an additional penalty for deserters from the armed forces and for enrolled draftees who departed from their district *or* from the United States "to avoid any draft into the military or naval service, duly ordered . . . ." That statute, as the Court correctly says, "was in terms

---

[2] 356 U. S., at 62 (dissenting opinion).

[3] In *Perez* v. *Brownell,* the Court pointed out that the provision of the Fourteenth Amendment that "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States . . ." does not restrict the power of Congress to enact denaturalization legislation. It was there stated that "there is nothing in the terms, the context, the history or the manifest purpose of the Fourteenth Amendment to warrant drawing from it a restriction upon the power otherwise possessed by Congress to withdraw citizenship." 356 U. S., at 58, n. 3.

[4] Act of March 3, 1865, § 21, 13 Stat. 490.

punitive," and I agree with the Court that the statute's legislative history, as well as subsequent judicial decisions construing it, makes it clear that the law *was* punitive—imposing additional punishment upon those convicted of either of the offenses mentioned.[5]

In these cases, however, we have before us statutes which were enacted in 1944 and 1952, respectively. In construing these statutes, I think nothing is to be gained from the legislative history of a quite different law enacted by a quite different Congress in 1865, nor from the reports of still another Congress which amended that law in 1912. Unlike the 1865 law, the legislation at issue in the cases before us is *not* "in terms punitive." And there is nothing in the history of *this* legislation which persuades me that these statutes, though not in terms penal, nonetheless embody a purpose of the Congresses which enacted them to impose criminal punishment without the safeguards of a criminal trial.

Unlike the two sections of the Nationality Act of 1940 which were in issue in *Perez* v. *Brownell*[6] and *Trop* v. *Dulles,*[7] § 401 (j) did not have its genesis in the Cabinet Committee's draft code which President Roosevelt submitted to Congress in 1938.[8] Indeed, § 401 (j) was the product of a totally different environment—the experience of a nation engaged in a global war.

On February 16, 1944, Attorney General Biddle addressed a letter to the Chairman of the Senate Immigra-

---

[5] This law was the direct predecessor of § 401 (g) of the Nationality Act of 1940, providing the additional penalty of loss of citizenship upon those convicted by court-martial of deserting the armed forces in time of war (a provision subsequently invalidated in *Trop* v. *Dulles,* 356 U. S. 86).

[6] 356 U. S. 44 (involving § 401 (e)).

[7] 356 U. S. 86 (involving § 401 (g)).

[8] See *Perez* v. *Brownell,* 356 U. S., at 52–57; *Trop* v. *Dulles,* 356 U. S., at 94–95; Codification of the Nationality Laws of the United States, H. R. Comm. Print, pt. 1, 76th Cong., 1st Sess. 68–69.

tion Committee, calling attention to circumstances which had arisen after the institution of the draft in World War II, and suggesting the legislation which subsequently became § 401 (j). The Attorney General's letter stated in part:

"I invite your attention to the desirability of enacting legislation which would provide (1) for the expatriation of citizens of the United States who in time of war or during a national emergency leave the United States or remain outside thereof for the purpose of evading service in the armed forces of the United States and (2) for the exclusion from the United States of aliens who leave this country for the above-mentioned purpose.

"Under existing law a national of the United States, whether by birth or by naturalization, becomes expatriated by operation of law if he (1) obtains naturalization in a foreign state; (2) takes an oath of allegiance to a foreign country; (3) serves in the armed forces of a foreign state if he thereby acquires the nationality of such foreign state; (4) accepts employment under a foreign state for which only nationals of such state are eligible; (5) votes in a political election in a foreign state or participates in an election or plebiscite to determine the sovereignty over foreign territory; (6) makes a formal renunciation of nationality before a diplomatic or consular officer of the United States in a foreign state; (7) deserts from the armed forces of the United States in time of war and is convicted thereof by a court martial; or (8) is convicted of treason (U. S. C., title 8, sec. 801). Machinery is provided whereby a person who is denied any right or privilege of citizenship on the ground that he has become expatriated may secure a judicial determination of his status; and if he is outside of the United States he is entitled to a

certificate of identity which permits him to enter and remain in the United States until his status has been determined by the courts (Nationality Act of 1940, sec. 503; U. S. C., title 8, sec. 903).

"The files of this Department disclose that at the present time there are many citizens of the United States who have left this country for the purpose of escaping service in the armed forces. While such persons are liable to prosecution for violation of the Selective Service and Training Act of 1940, if and when they return to this country, it would seem proper that in addition they should lose their United States citizenship. Persons who are unwilling to perform their duty to their country and abandon it during its time of need are much less worthy of citizenship than are persons who become expatriated on any of the existing grounds.

"Accordingly, I recommend the enactment of legislation which would provide (1) for the expatriation of citizens of the United States who in time of war or during a national emergency leave the United States or remain outside thereof for the purpose of evading service in the armed forces of the United States and (2) for the exclusion from the United States of aliens who leave this country for that purpose. Any person who may be deemed to have become expatriated by operation of the foregoing provision would be entitled to have his status determined by the courts pursuant to the above-mentioned section of the Nationality Act of 1940." [9]

The bill was passed unanimously by both the House and the Senate, and became Public Law No. 431 of the Seventy-eighth Congress. Neither the committee reports nor the limited debate on the measure in Congress

[9] S. Rep. No. 1075, 78th Cong., 2d Sess. 2.

adds any substantial gloss to the legislative action.[10]   And
the legislative history of § 349 (a)(10) of the Immigra-
tion and Nationality Act of 1952, the statute directly
involved in the second of the two cases now before us,

[10] The House Committee Report does contain some particulariza-
tion of the problem to which the legislation was addressed: "It is, of
course, not known how many citizens or aliens have left the United
States for the purpose of evading military service.   The Department
of Justice discovered that in the western district of Texas, in the
vicinity of El Paso alone, there were over 800 draft delinquents
recorded in the local Federal Bureau of Investigation office, born in
this country and, therefore citizens, who had crossed the border into
Mexico for the purpose of evading the draft, but with the expectation
of returning to the United States to resume residence after the war."
H. R. Rep. No. 1229, 78th Cong., 2d Sess. 1–2.   In explaining the
bill to the House Committee of the Whole, Representative Dickstein,
the Chairman of the House Committee on Immigration, stated: "I
would classify this piece of legislation as a bill to denaturalize and
denationalize all draft dodgers who left this country knowing that
there was a possibility that they might be drafted in this war and
that they might have to serve in the armed forces, in the naval forces,
or the marines, and in an effort to get out of such service.   We are
all American citizens and our country has a great stake in this war;
nevertheless, we have found hundreds of men who have left this
country to go to certain parts of Mexico and other South American
countries with the idea of evading military service and of returning
after the war is over, and taking their old places in our society."
90 Cong. Rec. 3261.

In explaining the bill to the Senate, Senator Russell, the Chairman
of the Senate Committee on Immigration, stated: "The . . . bill . . .
relates to the class of persons, whether citizens of the United States
or aliens, who departed from the United States in order to avoid
service in the armed forces of the United States under the Selective
Service Act.   Information before the committee indicated that on one
day several hundred persons departed from the United States through
the city of El Paso, Tex., alone, in order to avoid service in either
the Army or the Navy of the United States, and to avoid selection
under the selective-service law.   This bill provides that any person
who is a national of the United States, or an American citizen, and
who in time of national stress departed from the United States to

gives no additional illumination as to the purpose of the Eighty-second Congress, since the substantive provisions of that statute were but a recodification of § 401 (j) of the 1940 Act.[11]

The question of whether or not a statute is punitive ultimately depends upon whether the disability it imposes is for the purpose of vengeance or deterrence, or whether the disability is but an incident to some broader regulatory objective. See *Cummings* v. *Missouri,* 4 Wall. 277, 320, 322; *United States* v. *Lovett,* 328 U. S. 303, 308–312;

---

another country to avoid serving his country, shall be deprived of his nationality.

"It further provides that any alien who is subject to military service under the terms of the Selective Service Act, and who left this country to avoid military service, shall thereafter be forever barred from admission to the United States.

"Mr. President, I do not see how anyone could object to such a bill. An alien who remains in the country and refuses to serve in the armed forces in time of war is prosecuted under our laws, and if found guilty he is compelled to serve a term in the penitentiary. Under the terms of the Selective Service Act an American citizen who refuses to serve when he is called upon to do so is likewise subject to a prison term. Certainly those who, having enjoyed the advantages of living in the United States, were unwilling to serve their country or subject themselves to the Selective Service Act, should be penalized in some measure. This bill would deprive such persons as are citizens of the United States of their citizenship, and, in the case of aliens, would forever bar them from admission into the United States. Any American citizen who is convicted of violating the Selective Service Act loses his citizenship. This bill would merely impose a similar penalty on those who are not subject to the jurisdiction of our courts, the penalty being the same as would result in the case of those who are subject to the jurisdiction of our courts." 90 Cong. Rec. 7628–7629.

[11] Section 349 (a) (10) did add a presumption that failure to comply with any provision of the compulsory service laws of the United States means that the departure from or absence from the United States is for the purpose of avoiding military service. See pp. 215–219, *infra.*

*Trop* v. *Dulles,* 356 U. S., at 107–109. See generally, *Flemming* v. *Nestor,* 363 U. S. 603, 613–617; cf. *De Veau* v. *Braisted,* 363 U. S. 144, 160; *Communist Party* v. *Subversive Activities Control Board,* 367 U. S. 1, 83–88. In commenting on the nature of this kind of inquiry, the Court said in *Flemming* v. *Nestor,* "We observe initially that only the clearest proof could suffice to establish the unconstitutionality of a statute on such a ground. Judicial inquiries into Congressional motives are at best a hazardous matter, and when that inquiry seeks to go behind objective manifestations it becomes a dubious affair indeed. Moreover, the presumption of constitutionality with which this enactment, like any other, comes to us forbids us lightly to choose that reading of the statute's setting which will invalidate it over that which will save it." 363 U. S., at 617.

In the light of the standard enunciated in *Nestor,* I can find no clear proof that the prime purpose of this legislation was punitive. To be sure, there is evidence that the deterrent effect of the legislation was considered. Moreover, the attitude of some members of Congress toward those whom the legislation was intended to reach was obviously far from neutral. But the fact that the word "penalty" was used by an individual Senator in the congressional debates is hardly controlling. As THE CHIEF JUSTICE has so wisely remarked, "How simple would be the tasks of constitutional adjudication and of law generally if specific problems could be solved by inspection of the labels pasted on them!" [12]

It seems clear to me that these putative indicia of punitive intent are far overbalanced by the fact that this legislation dealt with a basic problem of wartime morale reaching far beyond concern for any individual affected. The legislation applies only to those who have left this

---

[12] *Trop* v. *Dulles,* 356 U. S., at 94.

country or remained outside of it for the purpose of avoiding the draft. Congress can reasonably be understood to have been saying that those who flee the country for such express purposes do more than simply disobey the law and avoid the imposition of criminal sanctions. They disassociate themselves entirely from their nation, seeking refuge from their wartime obligations under the aegis of another sovereign. Congress could reasonably have concluded that the existence of such a group, who voluntarily and demonstrably put aside their United States citizenship "for the duration," could have an extremely adverse effect upon the morale and thus the war effort not only of the armed forces, but of the millions enlisted in the defense of their nation on the civilian front. During the consideration of § 401 (j) in Congress there were repeated references to the expectation that fugitive draft evaders then living abroad would return to this country after the war to resume citizenship and to enjoy the fruits of victory. The effect upon wartime morale of the known existence of such a group, while perhaps not precisely measurable in terms of impaired military efficiency, could obviously have been considered substantial. Denationalization of this class of voluntary expatriates was a rational way of dealing with this problem by removing its visible cause. In light of this broader purpose, I cannot find, as the Court does, that § 401 (j) was motivated primarily by the desire to wreak vengeance upon those individuals who fled the country to avoid military service. Rather, the statute seems to me precisely the same kind of regulatory measure, rational and efficacious, which this Court upheld against similar objections in *Perez* v. *Brownell, supra.*[13]

---

[13] I cannot suppose that the Court today is saying that Congress can impose denationalization without the safeguards of a criminal trial for conduct which is unexceptionable—like marrying an alien— or relatively innocuous—like voting in a foreign election—but that Congress cannot do so for conduct which is reprehensible.

## III.

For the reasons stated, I cannot find in the terms of these statutes or in their legislative history anything close to the "clearest proof" that the basic congressional purpose was to impose punishment. But that alone does not answer the constitutional inquiry in these cases. As with any other exercise of congressional power, a law which imposes deprivation of citizenship, to be constitutionally valid, must bear a rational relationship to an affirmative power possessed by Congress under the Constitution. The appellants submit that in enacting this legislation, Congress could rationally have been drawing on any one of three sources of recognized constitutional power: the implied power to enact legislation for the effective conduct of foreign affairs; the express power to wage war, to raise armies, and to provide for the common defense; and the inherent attributes of sovereignty.

The appellants argue that this legislation, like the statutory provision sustained in *Perez* v. *Brownell, supra,* has a direct relationship to foreign affairs. They point out that international complications could arise if this country attempted to effect the return of citizen draft evaders by requests to a foreign sovereign which that nation might be unwilling to grant. The appellants insist that the possibility of international embroilments resulting from problems caused by fugitive draft evaders is not fanciful, pointing to the background of international incidents preceding the War of 1812, and the long history, later in the nineteenth century, of this country's involvement with other nations over the asserted liability of our naturalized citizens to military obligations imposed by their native countries.[14] Expatriation of those who leave or remain

[14] See III Moore, Digest of International Law (1906), §§ 434, 436–438, 440; Tsiang, The Question of Expatriation in America Prior to 1907 (1942), 44–55, 71–72, 78–84.

away from the United States with draft evasion as their purpose, the appellants say, might reasonably be attributed to a congressional belief that this was the only practical way to nip these potential international problems in the bud. Compare Perez v. Brownell, 356 U. S., at 60; Trop v. Dulles, 356 U. S., at 106 (concurring opinion).

In the view I take of this case, it is unnecessary to pursue further an inquiry as to whether the power to regulate foreign affairs could justify denationalization for the conduct in question. For I think it apparent that Congress in enacting the statute was drawing upon another power, broad and far reaching.

A basic purpose of the Constitution was to "provide for the common defence." To that end, the Framers expressly conferred upon Congress a compendium of powers which have come to be called the "war power." [15] Responsive to the scope and magnitude of ultimate national need, the war power is "the power to wage war successfully." See Charles Evans Hughes, War Powers under the Constitution, 42 A. B. A. Rep. 232, 238.

It seems to me evident that Congress was drawing upon this power when it enacted the legislation before us. To be sure, the underlying purpose of this legislation can

---

[15] "The Congress shall have Power . . . .

.        .        .        .        .

"To declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water;

"To raise and support Armies, but no Appropriation of Money to that Use shall be for a longer Term than two Years;

"To provide and maintain a Navy;

"To make Rules for the Government and Regulation of the land and naval Forces;

.        .        .        .        .

"To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." Art. I, § 8, cls. 11, 12, 13, 14, 18.

hardly be refined to the point of isolating one single, precise objective. The desire to end a potential drain upon this country's military manpower was clearly present in the minds of the legislators and would itself have constituted a purpose having sufficient rational nexus to the exercise of the war power. Indeed, there is no more fundamental aspect of this broad power than the building and maintaining of armed forces sufficient for the common defense. *Selective Draft Law Cases,* 245 U. S. 366; see *Falbo* v. *United States,* 320 U. S. 549. But, in any event, the war power clearly supports the objective of removing a corrosive influence upon the morale of a nation at war. As the Court said in *Hirabayashi* v. *United States,* 320 U. S. 81, 93, the war power "extends to every matter, and activity so related to war as substantially to affect its conduct and progress. The power is not restricted to the winning of victories in the field and the repulse of enemy forces. It embraces every phase of the national defense, including the protection of war materials and the members of the armed forces from injury and from the dangers which attend the rise, prosecution and progress of war." See *Lichter* v. *United States,* 334 U. S. 742.

This legislation is thus quite different from the statute held invalid in *Trop* v. *Dulles, supra.* In that case there were not five members of the Court who were able to find the "requisite rational relation" between the war power of Congress and § 401 (g) of the 1940 Act imposing denationalization upon wartime deserters from the armed forces. As the concurring opinion pointed out, the statute was "not limited in its effects to those who desert in a foreign country or who flee to another land." 356 U. S., at 107. Indeed, "The Solicitor General acknowledged that forfeiture of citizenship would have occurred if the entire incident had transpired in this country." 356 U. S., at 92. It was emphasized that conduct far short of disloyalty could technically constitute the military offense

of desertion, 356 U. S., at 112, 113, and that the harshness of denationalization for conduct so potentially equivocal was "an important consideration where the asserted power to expatriate has only a slight or tenuous relation to the granted power." 356 U. S., at 110.

The legislation now before us, on the other hand, is by its terms completely inapplicable to those guilty of draft evasion who have remained in the United States; it is exclusively aimed at those, whether or not ever criminally convicted, who have gone to or remained in another land to escape the duty of military service. Moreover, the conduct which the legislation reaches could never be equivocal in nature, but is always and clearly a "refusal to perform this ultimate duty of American citizenship." *Trop* v. *Dulles,* 356 U. S., at 112 (concurring opinion).

## IV.

There is one more point to be made as to the substantive provisions of the legislation before us in these cases. Previous decisions have suggested that congressional exer· cise of the power to expatriate may be subject to a further constitutional restriction—a limitation upon the kind of activity which may be made the basis of denationalization. Withdrawal of citizenship is a drastic measure. Moreover, the power to expatriate endows government with authority to define and to limit the society which it represents and to which it is responsible.

This Court has never held that Congress' power to expatriate may be used unsparingly in every area in which it has general power to act. Our previous decisions upholding involuntary denationalization all involved conduct inconsistent with undiluted allegiance to this country. But I think the legislation at issue in these cases comes so clearly within the compass of those decisions as to make unnecessary in this case an inquiry as to

what the ultimate limitation upon the expatriation power may be.

The conduct to which this legislation applies, involving not only the attribute of flight or absence from this country in time of war or national emergency, but flight or absence for the express purpose of evading the duty of helping to defend this country, amounts to an unequivocal and conspicuous manifestation of nonallegiance, whether considered objectively or subjectively. Ours is a tradition of the citizen soldier. As this Court has said, "[T]he very conception of a just government and its duty to the citizen includes the reciprocal obligation of the citizen to render military service in case of need and the right to compel it." *Selective Draft Law Cases,* 245 U. S. 366, at 378. It is hardly an improvident exercise of constitutional power for Congress to disown those who have disowned this Nation in time of ultimate need.

## V.

For the reasons stated, I believe the substantive provisions of § 401 (j) of the 1940 Act and of § 349 (a)(10) of the 1952 Act are constitutionally valid. In addition to its substantive provisions, however, § 349 (a)(10) declares:

> "For the purposes of this paragraph failure to comply with any provision of any compulsory service laws of the United States shall raise the presumption that the departure from or absence from the United States was for the purpose of evading or avoiding training and service in the military, air, or naval forces of the United States."

I think the evidentiary presumption which the statute creates is clearly invalid, and that it fatally infected the administrative determination that Joseph Henry Cort had lost his citizenship.

The District Court did not mention this statutory presumption, and it is, therefore, impossible to know how much the court relied upon it, if at all. Indeed, the District Court's attention in this case was oriented primarily towards the issue of its jurisdiction and the basic issue of the constitutionality of the substantive provisions of § 349 (a)(10). In view of its holding that § 349 (a)(10) is unconstitutional, the court understandably did not give exhaustive attention to the factual issues presented, devoting but a single short paragraph to the question of whether Cort's conduct had brought him within the statute. 187 F. Supp., at 686.

But it is clear that the final reviewing agency in the State Department relied heavily upon this presumption in determining that Cort had lost his citizenship. The Board of Review on the Loss of Nationality, in its memorandum affirming the initial administrative determination that Cort had lost his citizenship, stated that "[b]y failing to comply with the notices sent to him by his local board, Dr. Cort brought upon himself the presumption mentioned in Section 349 (a)(10), that his continued absence from the United States was for the purpose of evading or avoiding training and service in the military, air, or naval forces of the United States. *Even if the Board should consider that the presumption could be overcome* by showing that a person remained abroad for a purpose other than to avoid the military service, the evidence in Dr. Cort's case, taken as a whole, does not show that he remained abroad for a purpose other than to avoid being drafted." (Emphasis added.) One of the Board's specific findings was "that Dr. Cort has not overcome the presumption raised in the last sentence of Section 349 (a)(10) of the Immigration and Nationality Act."

As was said in *Speiser* v. *Randall*, 357 U. S. 513, at 520–521, "it is commonplace that the outcome of a law-

suit—and hence the vindication of legal rights—depends more often on how the factfinder appraises the facts than on a disputed construction of a statute or interpretation of a line of precedents. Thus the procedures by which the facts of the case are determined assume an importance fully as great as the validity of the substantive rule of law to be applied. And the more important the rights at stake the more important must be the procedural safeguards surrounding those rights."

The presumption created by § 349 (a)(10) is wholly at odds with the decisions of the Court which hold that in cases such as this a heavy burden is upon the Government to prove an act of expatriation by clear, convincing, and unequivocal evidence. *Gonzales* v. *Landon,* 350 U. S. 920; *Nishikawa* v. *Dulles,* 356 U. S. 129. This standard commands that "evidentiary ambiguities are not to be resolved against the citizen." *Nishikawa* v. *Dulles,* 356 U. S., at 136.

Without pausing to consider whether this evidentiary standard is a constitutional one, it is clear to me that the statutory presumption here in question is constitutionally invalid because there is insufficient "rational connection between the fact proved and the ultimate fact presumed." *Tot* v. *United States,* 319 U. S. 463, 467. "A statute creating a presumption that is arbitrary or that operates to deny a fair opportunity to repel it violates the due process clause of the Fourteenth Amendment." *Manley* v. *Georgia,* 279 U. S. 1, 6. A federal statute which creates such a presumption is no less violative of Fifth Amendment due process. "Mere legislative fiat may not take the place of fact in the determination of issues involving life, liberty or property." *Ibid.* It is "essential that there shall be some rational connection between the fact proved and the ultimate fact presumed, and that the inference of one fact from proof of another shall not be

so unreasonable as to be a purely arbitrary mandate."
*Mobile, J. & K. C. R. Co.* v. *Turnipseed,* 219 U. S. 35, 43.
Cf. *Speiser* v. *Randall, supra.*

The failure of a person abroad to comply with notices
sent by his draft board would obviously be relevant evi-
dence in determining whether that person had gone or
remained abroad for the purpose of avoiding military serv-
ice. But the statute goes much further. It creates a
presumption of an expatriating act from failure to comply
with *"any* provision of *any* compulsory service laws" by
a citizen abroad, regardless of the nature of the violations
and regardless of the innocence of his purpose in originally
leaving the United States. The various compulsory serv-
ice laws of the United States contain a multitude of pro-
visions, many of them technical or relatively insignifi-
cant. To draw from the violation of a single such pro-
vision a presumption of expatriation, with its solemn
consequences, is, I think, to engage in irrationality so
gross as to be constitutionally impermissible.[16]

It is clear from the record in this case that Cort's sole
purpose in leaving the United States in 1951 was to accept
a position as a Research Fellow at the University of Cam-
bridge, England. The record also makes clear that in
1946 Cort was called up under the Selective Service law,
physically examined, and classified as 4F because of
physical disability. The record further shows that Cort
voluntarily registered under the Doctors Draft Act,
making special arrangements with his draft board to do
so in advance of the effective date for registration under
the statute, a few days before he left for Europe. Cort
filed an affidavit in which he swore that it was his belief,

---

[16] *McFarland* v. *American Sugar Rfg. Co.,* 241 U. S. 79, 86; *Western
& Atlantic R. Co.* v. *Henderson,* 279 U. S. 639, 642; *Morrison* v.
*California,* 291 U. S. 82, 90. See *Bailey* v. *Alabama,* 219 U. S. 219,
239; *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61, 81.

in the light of his physical disability, that the induction order which he received in England was not issued in good faith to secure his military service, but that its purpose instead was to force him to return to the United States to be investigated by the House Committee on Un-American Activities or prosecuted under the Smith Act. He has made repeated efforts to arrange with Selective Service officials for the fulfillment, albeit belatedly, of his military obligations, if any, and in 1959 his wife came to the United States and met with officials of the Selective Service system for that purpose. The very reason he applied in Prague for a United States passport was, as he swore, so that he could return to the United States in order to respond to the indictment for draft evasion now pending against him in Massachusetts and to fulfill his Selective Service obligations, if any. When Cort applied in Prague for a passport, the American Consul there, who interviewed him, stated his opinion in writing that he had no reason to disbelieve Cort's sworn statement that he had not remained outside the United States to avoid military service.[17] I mention this evidence as disclosed by the present record only to indicate why I think a new administrative hearing freed from the weight of the statutory presumption is in order, not to imply any prejudgment of what I think the ultimate administrative decision should be.

In No. 3, *Rusk* v. *Cort,* I would vacate the judgment of the District Court and remand the case with instructions to declare null and void the certificate of loss of nationality

---

[17] The United States Consul said, "Without evidence to the contrary, the consular officer has no reason to doubt Dr. Cort's statements made in the attached affidavit which purports to answer the charge that he departed from and remained outside the jurisdiction of the United States for the purpose of evading or avoiding training and service in the armed forces of the United States."

issued to Cort by the Secretary of State, so that upon Cort's renewed application for a passport, an administrative hearing could be had, free of the evidentiary presumption of § 349 (a)(10). In the event that such administrative proceedings should result in a finding that Cort had lost his United States citizenship, he would be entitled to a *de novo* judicial hearing [18] in which the Government would have the burden of proving an act of expatriation by clear, convincing, and unequivocal evidence. *Gonzales* v. *Landon,* 350 U. S. 920; *Nishikawa* v. *Dulles,* 356 U. S. 129.

In No. 2, *Kennedy* v. *Mendoza-Martinez,* I would reverse the judgment of the District Court.

---

[18] *Ng Fung Ho* v. *White,* 259 U. S. 276; *Kessler* v. *Strecker,* 307 U. S. 22, 35; *Frank* v. *Rogers,* 102 U. S. App. D. C. 367, 253 F. 2d 889.