*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0123**

In the Matter of the Appeal by Tami L. Kreuzer
of the Maltreatment Determination and Order to Forfeit a Fine

**Filed December 28, 2015
Affirmed
Larkin, Judge
Dissenting, Randall, Judge\***

Minnesota Department of Human Services
OAH Docket No. 8-1800-31089

John L. Lucas, Minneapolis, Minnesota (for relator)

Lori Swanson, Attorney General, Stephanie M. Hilstrom, Assistant Attorney General, St. Paul, Minnesota (for respondent)

Considered and decided by Worke, Presiding Judge; Larkin, Judge; and Randall, Judge.

**U N P U B L I S H E D   O P I N I O N**

**LARKIN**, Judge

Relator care-provider challenges respondent commissioner's maltreatment determination. Because the determination is the result of reasoned decision-making and supported by substantial evidence, we affirm.

---

\* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**FACTS**

Relator Tami L. Kreuzer is licensed to provide adult foster care and residential habilitation services. In July 2013, the Minnesota Department of Human Services (DHS) determined that Kreuzer had committed maltreatment by neglect and fined her $1,000. Kreuzer appealed to an administrative-law judge (ALJ). The ALJ held an evidentiary hearing and determined that the relevant facts are as follows.

Kreuzer operates an adult foster-care facility in Isanti, Minnesota, and lives at the facility with three family members. In October 2012, a vulnerable adult (VA) also resided at the facility. The VA was diagnosed with a mild-to-moderate intellectual disability, "has poor balance, does not accurately report injury or illness[,] and may falsely report medical concerns." The VA's risk-management-and-assessment plan provides that:

> Staff will investigate all claims of injury and/or illness to ensure accuracy of the report. Staff [will seek] appropriate medical attention as needed and communicate[] concerns to the team. [The VA's] residential provider and staff will schedule medical appointments and will transport and accompany him to his appointments.

On October 22, 2012, Kreuzer took the VA to a hospital for routine tests. The hospital was the VA's primary-care provider and had all of the VA's medical records. After returning from the hospital, Kreuzer noticed that the VA was tired and sluggish and "seemed off." The VA was scheduled to go bowling after dinner, but Kreuzer kept the VA home because she was concerned about the VA's physical condition. At 8:00 p.m., the VA was argumentative and no longer recognized Kreuzer.

2

Kreuzer called 911 to have the VA transported back to the hospital. When the ambulance arrived, Kreuzer explained her observations and concerns regarding the VA to the paramedics and provided them with a list of the VA's medications. According to the assigned DHS investigator, Kreuzer told the paramedics that "there may have been a medication-related overdose" because she had found one unidentified pill in the facility kitchen. The paramedics transported the VA to the hospital. Kreuzer did not go to the hospital, but she presumed that the hospital would call her within the next two hours to discuss the VA's condition.

Hospital staff attempted to call Kreuzer four times that evening. They called the facility's phone number three times and Kreuzer's cell phone one time. Neither Kreuzer nor her family members answered the calls. The DHS investigator testified that Kreuzer reported that she did not hear the facility phone ring because she did not have a phone in her bedroom and a fan was running in the room. Kreuzer's cell phone was unplugged, and its battery was dead. According to the DHS investigator, the hospital left Kreuzer three messages. The first two messages were from hospital staff seeking information and answers to questions regarding the VA. The third message was from a doctor who stated that he "was unable to determine why the [VA] was at the hospital and was ready to send [the VA] home."

A doctor ultimately admitted the VA to the hospital, where the VA remained for three days. The VA was diagnosed with a condition that required surgery. The hospital's inability to contact Kreuzer did not cause the VA any physical harm. But a doctor opined that Kreuzer's unavailability impacted the VA's treatment because it was unclear why

3

Kreuzer thought the VA needed to be hospitalized and the VA told hospital staff that he was not suffering from any health problems. The DHS investigator testified:

> [The hospital staff] didn't have enough information to just clearly just address the things that might actually be going on with [the VA].
> They didn't have enough information about [Kreuzer's] concerns about [the VA's] high blood pressure and how it had been fluctuating and the information about how [the VA's] behavior had been different that day. The doctor didn't have those pieces of information, and in that time period while the doctor was analyzing what was necessary for [the VA,] the doctor said . . . that he didn't have enough information to know exactly what to do, and as a result at 11:30 p.m. [the doctor] admitted [the VA] to the hospital because he didn't know for sure what was going on.

Kreuzer told the DHS investigator that her failure to go to the hospital and provide information, and her unavailability when the hospital called, was "a total screw up" on her part. Sometime after the incident, Kreuzer received a policy from her licenser that states, "If the client is transported to the hospital, arrange for staff to meet the client at the hospital to answer any medical questions."

The ALJ recommended affirming DHS's maltreatment determination and imposition of a fine. Respondent Minnesota Commissioner of Human Services adopted the ALJ's recommendations and affirmed the determination and fine. Kreuzer appeals by writ of certiorari.

## DECISION

On review of a decision by the DHS commissioner, this court

> may affirm the decision . . . or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioner[] may have been prejudiced

4

because the administrative finding, inferences, conclusion, or decisions are:
    (a)   in violation of constitutional provisions; or
    (b)   in excess of the statutory authority or jurisdiction of the agency; or
    (c)   made upon unlawful procedure; or
    (d)   affected by other error of law; or
    (e)   unsupported by substantial evidence in view of the entire record as submitted; or
    (f)   arbitrary or capricious.

Minn. Stat. § 14.69 (2014); *see In re O'Boyle*, 655 N.W.2d 331, 334 (Minn. App. 2002) (stating that section 14.69 governs this court's review of the DHS commissioner's decisions).

"[D]ecisions of administrative agencies enjoy a presumption of correctness, and deference should be shown by courts to the agencies' expertise and their special knowledge in the field of their technical training, education, and experience." *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 824 (Minn. 1977). "If an administrative agency engages in reasoned decisionmaking, [an appellate] court will affirm, even though it may have reached a different conclusion had it been the factfinder." *Cable Commc'ns Bd. v. Nor-West Cable Commc'ns P'ship*, 356 N.W.2d 658, 669 (Minn. 1984).

Kreuzer contends that the DHS commissioner's maltreatment determination should be vacated because it is unsupported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Minneapolis Van & Warehouse Co. v. St. Paul Terminal Warehouse Co.*, 288 Minn. 294, 299, 180 N.W.2d 175, 178 (1970) (quotation omitted).

As to the determination, "[m]altreatment" includes "abuse," "neglect," and "financial exploitation." Minn. Stat. § 626.5572, subd. 15 (2014). "Neglect" means

> [t]he failure or omission by a caregiver to supply a vulnerable adult with care or services, including but not limited to, food, clothing, shelter, health care, or supervision which is:
> (1) reasonable and necessary to obtain or maintain the vulnerable adult's physical or mental health or safety, considering the physical and mental capacity or dysfunction of the vulnerable adult; and
> (2) which is not the result of an accident or therapeutic conduct.

*Id.*, subd. 17(a) (2014).

Kreuzer argues that the commissioner's maltreatment determination is erroneous because the VA was a patient at a hospital when the conduct found to be maltreatment occurred and "was being treated by a team of doctors and nurses monitoring his every vital sign around the clock." She insists that she provided "the best possible care for [the VA's] situation" by sending the VA to the hospital and that the hospital's "[i]nability to contact [her] on the telephone did not somehow take the medical care out of the realm of reasonable and necessary." She notes that "it is not reasonable to expect a care giver to stay in the hospital with a client 24 hours a day for three days."

Kreuzer's argument ignores the reasoning underlying the commissioner's maltreatment determination. The commissioner reasoned that Kreuzer "was not available to provide reasonable and necessary healthcare services to [the VA] when she was not available to provide information regarding [the VA's] health status on the evening of October 22, 2012." The commissioner noted the VA's intellectual disability, health issues, and inability to accurately report injuries or illnesses. The commissioner acknowledged

6

that Kreuzer provided the paramedics with a list of the VA's medications and information regarding the VA's health condition but concluded that Kreuzer's actions were "not sufficient in light of [the VA's] needs." The commissioner also concluded that the lack of information was a "major handicap" to the hospital staff and impacted the VA's treatment. The commissioner's determination that Kreuzer's unavailability resulted in maltreatment is supported by reasoned analysis, and it is consistent with the statutory definition of maltreatment. *See* Minn. Stat. § 626.5572, subds. 15, 17(a). The determination is also supported by substantial evidence.

Kreuzer suggests that her unavailability is immaterial because the VA was not physically harmed. She argues that "[f]ailing to hear a telephone ring is not neglect" because it did not create a "risk of harm." But the statutory definition of neglect does not require that a vulnerable adult suffer physical harm from the alleged neglect. *See* Minn. Stat. § 626.5572, subd. 17(a). The statute merely requires "failure . . . by a caregiver to supply a vulnerable adult with care or services . . . which is . . . reasonable and necessary to obtain or maintain the vulnerable adult's physical . . . health . . . considering the physical and mental capacity or dysfunction of the vulnerable adult." *Id.* As the commissioner stated in the memorandum explaining her determination, DHS "is not required to wait until harm occurs to take action to address deficiencies in licensed programs."

Kreuzer also argues that she had "no additional facts to share with medical personnel." But that argument contradicts the commissioner's finding that Kreuzer expected the hospital to call her to discuss the VA's condition and Kreuzer's testimony that she did not anticipate falling asleep and thought that she would hear the telephone ring.

Lastly, Kreuzer argues that her conduct is excusable because she was providing therapeutic conduct. Neglect does not occur if "an individual makes an error in the provision of therapeutic conduct to a vulnerable adult which does not result in injury or harm which reasonably requires medical or mental health care." Minn. Stat. § 626.5572, subd. 17(c)(4) (2014). "Therapeutic conduct" means "the provision of program services, health care, or other personal care services done in good faith in the interests of the vulnerable adult by . . . a caregiver." Minn. Stat. § 626.5572, subd. 20 (2014).

At oral argument before this court, Kreuzer's attorney asserted that Kreuzer provided therapeutic conduct by making herself available to provide information in case the hospital called and that she erred in providing that therapeutic conduct by falling asleep and missing the hospital's calls. Accepting, for the sake of argument, Kreuzer's assertion that availability equates with the provision of therapeutic conduct, Kreuzer's argument fails because she did not make herself available. This is not a case in which Kreuzer was only partially available to provide information sought by the VA's medical providers. It is a case in which Kreuzer was completely unavailable to provide the information. Kreuzer's complete failure to act does not fall within the therapeutic-conduct exception to neglect. *See J.R.B. v. Dep't of Human Servs.*, 633 N.W.2d 33, 38 (Minn. App. 2001) (concluding that the therapeutic-conduct exception did not apply to a nurse who failed to check a patient's vital signs), *review denied* (Minn. Oct. 24, 2001).

In sum, none of Kreuzer's arguments warrants reversal. Because the commissioner's maltreatment determination is based on reasoned decision-making and the

8

relevant evidence would cause a reasonable mind to conclude that Kreuzer committed maltreatment by neglect, we affirm the commissioner's determination.

**Affirmed**

RANDALL, Judge (dissenting)

I respectfully dissent. There is substantial evidence in the record that relator Tami L. Kreuzer was providing good-faith therapeutic conduct for the vulnerable adult (VA). I would reverse.

The majority correctly states the basic facts. Kreuzer took the VA to the hospital for testing. After she brought the VA back to his foster-care facility, she noticed the VA still appeared "off" and wisely kept him home from his bowling night. She was concerned about his physical condition. At 8:00 p.m. she saw further deterioration, called 911 to get the VA back to the hospital, relayed all her observations and concerns regarding the VA to the paramedics, and provided the paramedics with a list of his medications. She also told the paramedics that there may have been a medically-related overdose. The paramedics brought the VA to the hospital. Kreuzer did not go along this time because the VA had the paramedics' transportation.

Then Kreuzer waited for the phone call, which she expected to come from the hospital. It did not go through. I accept the DHS investigator's report that she did not have a phone in her bedroom and that her cell phone was unplugged with a dead battery.

The last message from the doctor provided the "possibility" that the VA might be ready to send home. The record does not show that everything Kreuzer told the paramedics was transferred to the doctor and staff. The doctor chose the wiser choice and admitted the VA to the hospital where he was diagnosed with a serious condition that required surgery. So the VA received the medical care that he was supposed to receive. If one of the phone calls had gotten through, and Kreuzer had spoken directly to the doctor and reiterated what

1

she told the paramedics, <u>the result would have been the same</u>.  The VA would have been kept in the hospital and received proper care.

The DHS investigator's testimony regarding what information hospital staff had is at odds with the undisputed fact Kreuzer gave all the information she had to the paramedics. It is unclear why that was not enough information.

I can point out that the hospital had the VA for a patient for a lengthy time and had all of his medical records.  That, coupled with what Kreuzer told the paramedics, was enough to alert the hospital about his care.[1]

If there was a failure to give care or services, which I do not find, that failure is not neglect if it results from "therapeutic conduct."  Minn. Stat. § 626.5572, subd. 17(a) (2014). "'Therapeutic conduct' is a caregiver's good-faith provision of services in the vulnerable adult's interests."  *In re O'Boyle*, 655 N.W.2d 331, 335 (Minn. App. 2002) (citing Minn. Stat. Minn. § 626.5572, subd. 20 (1998)).  Additionally, there is no neglect if the sole basis is "an error in the provision of therapeutic conduct to a vulnerable adult which does not result in injury or harm which reasonably requires medical or mental health care."  Minn. Stat. § 626.5572, subd. 17(c)(4) (2014).  "If a caregiver ostensibly 'neglects' a vulnerable adult, there is no statutory neglect, and hence no maltreatment, if a therapeutic-conduct

---

[1] A little bit of hysteria entered this case.  There was a rumor for a while that hospital staff called the local sheriff's office to pay a visit to Kreuzer and they could not find her. Fortunately this myth got cleared up at oral argument.  According to the attorneys, the "sheriff's event" never happened.  The DHS investigator had also alleged that Kreuzer was not providing appropriate care for a second vulnerable adult (VA2) in the facility by failing to monitor him the same evening that the VA went to the hospital.  The record reflects that VA2 went bowling with Kreuzer's family and then went to bed.  The ALJ properly reversed the determination that Kreuzer was responsible for maltreatment of VA2.

exception applies." *O'Boyle*, 655 N.W.2d at 335. The commissioner did not make any findings on these statutory exceptions!

The majority relies on *J.R.B. v. Dep't of Human Servs.*, 633 N.W.2d 33, 38 (Minn. App. 2001), *review denied* (Minn. Oct. 24, 2001), to conclude that "Kreuzer's complete failure to act does not fall within the therapeutic-conduct exception to neglect." This case is inapposite and out of the ballpark. The nurse in that case made several mistakes, including failing to check vital signs and failing to call the doctor, which ultimately resulted in the vulnerable adult's death. *Id.* at 36, 38. This court affirmed the commissioner's determination that the nurse was not providing therapeutic conduct because the failure "to check a patient's vital signs cannot be considered therapeutic." *Id.* at 38. Additionally, the mistake exception to the neglect statute was not available because, at the time of the offense, that statute allowed only one mistake, and that nurse had made more than one mistake! *Id.* (citing Minn. Stat. § 626.5572, subd. 17(c)(4) (1996)).

Based on the record, there is substantial evidence that Kreuzer provided therapeutic conduct for the VA while he was in her care. She took the VA to a medical appointment in the morning, kept him home from an evening outing because he "seemed off," called 911 when his condition worsened, and explained her observations and concerns, as well as provided a list of medications to the paramedics who responded to the 911 call. Kreuzer fulfilled her obligation. The VA would receive reasonable and necessary care at the hospital. Although Kreuzer should have been available by phone, even accepting the DHS investigative report about the phone calls not going through, Kreuzer was still engaging in good-faith therapeutic conduct. Kreuzer's conduct was also consistent with the VA's risk-

3

management-and-assessment plan. Kreuzer's therapeutic conduct perhaps did not go as far as it should when she was unavailable to answer phone calls from the hospital about the VA's continued care. *See C.J.K. v. State, Dep't of Health*, C9-00-583, 2000 WL 1617815, at \*3 (Minn. App. Oct. 31, 2000) (reversing commissioner's maltreatment determination where nurse's "conduct was not medically inappropriate; it simply did not go far enough"); *see also State v. Roy*, 761 N.W.2d 883, 888 (Minn. App. 2009) (stating that, although unpublished opinions are not precedential, they may be persuasive). This error did not cause the VA harm. He received the medical treatment needed at the hospital when the phone call did not go through, which he would have received even if the phone call had gone through.

A few examples should help. Therapeutic conduct can occur in a hospital setting, clinic, rehabilitative home, etc. Assume during major heart-lung surgery, there will be a staff of doctors actively involved in the patient's care as well on-call surgeons, anesthesiologists, cardiologists, and even the patient's primary care doctor. Each doctor is ready to step in if needed, but whose help is not required, and hopefully will not be. If the operation is a total success and the hospital public-relations department wants a team picture of all those involved in the patient's therapeutic care, the physicians and nurses not needed but on call will not be excluded from that picture.

Consider the obstetrician at home on call with a beeper who gets the call that the baby came early, and the physician's nurse and resident on call performed a successful delivery. It cannot be said that the primary physician who attended the mother throughout

4

her pregnancy but just happened to be at home when the baby came was not acting in a therapeutic mode.

There is no reason to stretch the term "therapeutic conduct" to the breaking point to hold it against Kreuzer. The law of construction is the reverse. Penal statutes are strictly construed, which means we resolve any doubt in favor of the defendant. *See State v. Olson,* 325 N.W.2d 13, 19 (Minn. 1982) ("[T]he rule of strict construction to be applied in interpreting penal statutes requires that all reasonable doubts concerning the legislative intent be resolved in favor of the defendants."). Although the maltreatment of a vulnerable adult statute is not in the criminal code and does not necessarily result in a criminal conviction, the action is initiated by the state through DHS and Minnesota Statutes section 245A.07, subdivision 3(c)(4) (2014), permits the commissioner to impose a substantial fine of $1,000 as a penalty.[2] *See Rew v. Bergstrom*, 845 N.W.2d 764, 790-91 (Minn. 2014) (analyzing whether 50-year order for protection created criminal penalty for purposes of ex post facto challenge to constitutionality of statute). This "civil proceeding" has a lifelong maltreatment label so punitive that it is effectively a criminal penalty. *See Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69, 184, 83 S. Ct. 554, 567-68, 575 (1963) (concluding that depriving a person of citizenship for avoiding the draft was punitive and required procedural safeguards of a criminal prosecution); *see also Prideaux v. State, Dep't of Pub. Safety,* 310 Minn. 405, 411, 247 N.W.2d 385, 389 (1976) ("We cannot allow a 'civil' label to obscure the quasi-criminal consequences of revocation to the ordinary

---

[2] Maltreatment also includes "abuse," which is defined in terms of criminal statutes, such as assault and criminal sexual conduct. Minn. Stat. § 626.5572, subds. 2(a), 15 (2014).

citizen."). Kreuzer is entitled as a matter of law to a strict construction in her favor. From the facts, I find Kreuzer's conduct easily came within the therapeutic-conduct exception.

The penalty of having her record show "maltreatment of a vulnerable adult" is a nasty and undeserved lifelong badge. It is a bureaucratic term thought up by those who will never have to suffer the consequences. At oral argument, respondent conceded that, although Kreuzer was not fired over the incident, she could have been. Now with this badge on her record, she will not get a second chance. What hospital, clinic, vulnerable adult facility, etc. will take her on if she tries to find another job in this field? If she feels she has to get out of the medical field, which appears to be her first choice, do you think that Target or Walmart, among four qualified people including Kreuzer, would jump at the chance to hire Kreuzer after they have received, as they always do, a report from her previous employers?

Run the term "maltreatment of a vulnerable adult" by 20 ordinary citizens on the street and ask what they think the term means. All 20 will come up with some variation of physical, sexual, or emotional abuse of an older person and not feel good about whatever person carries that label.

The majority talks about the "presumption of correctness" of administrative agencies. Administrative agencies, like trial courts and juries, do not get any deference unless they get it right, or at least come reasonably close. Here the administrative agency was not even close. The agency was not anywhere near the facts and law regarding the therapeutic mode exception, which the ALJ did not address.

6

Clearly, Kreuzer is entitled to the therapeutic-mode exception, which the ALJ missed.

To repeat, there's no just reason to hang the derogatory badge of maltreatment of a vulnerable adult on Kreuzer.  I would reverse outright.